**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF GEORGIA**
**SAVANNAH DIVISION**

TINA HATTERER,

        Movant,

    v.

UNITED STATES OF AMERICA,

        Respondent.

CIVIL ACTION NO.: 4:20–cv–223

(Case No.: 4:19–cr–66)

## O R D E R

After Tina Hatterer pleaded guilty to one count of conspiracy to possess with intent to distribute, and to distribute, fifty grams or more of methamphetamine, in violation of 21 U.S.C. § 846, and one count of possession of a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c), the Court sentenced her to 120 months' imprisonment on November 7, 2019. (Doc. 454.)[1] Hatterer filed a Motion to Modify Sentence, (doc. 647), Motion to Vacate, Set Aside, or Correct her Sentence pursuant to 28 U.S.C. § 2255, (doc. 693), and Motion to Challenge District Court's Ruling, (doc. 694).[2] Hatterer contends that various errors by her trial counsel and the Court plagued her guilty plea and sentence. As laid out below, Hatterer's far–reaching claims lack merit and pursuant to Rule 4(b) of the Rules Governing Section 2255 Proceedings it "plainly appears from the motion, any attached exhibits, and the

---

[1] The pertinent record documents in this case are filed on the docket of Hatterer's criminal case, United States v. Hatterer, 4:19-cr-66 (S.D. Ga. May 7, 2019), and many are not included in her civil docket. Thus, for ease of reference and consistency, the Court cites to Hatterer's criminal docket in this Order.

[2] The Court **GRANTS** Hatterer's Motion to Amend her Motion to Modify Sentence, (doc. 678). The Court has considered the arguments contained in all Hatterer's pleadings and has also considered all attachments she has provided.

record of prior proceedings that the moving party is not entitled to relief."  Hatterer's conviction and sentence resulted from her own admitted criminal conduct, not any errors by the Court or her counsel.   Thus, for the reasons which follow, the Court **DENIES** her Motion to Modify Sentence, (doc. 647), Motion to Vacate, Set Aside, or Correct her Sentence pursuant to 28 U.S.C. § 2255, (doc. 693), and Motion to Challenge District Court's Ruling, (doc. 694).[3]  Further, the Court **DENIES** Hatterer's Motion to Appoint Counsel, (doc. 775), and **DENIES** her a Certificate of Appealability and *in forma pauperis* status on appeal.   The Court **DIRECTS** the Clerk of Court to **CLOSE** this case and enter the appropriate judgment of dismissal.[4]

---

[3]  There is no automatic constitutional right to counsel in habeas proceedings.  See Pennsylvania v. Finley, 481 U.S. 551, 555 (1987); United States v. Webb, 565 F.3d 789, 794 (11th Cir. 2009) (citing Barbour v. Haley, 471 F.3d 1222, 1227 (11th Cir. 2006)); Hooks v. Wainwright, 775 F.2d 1433, 1438 (11th Cir. 1985); see also Barbour, 471 F.3d at 1227–32 (even defendants sentenced to death do not enjoy a constitutional right to post-conviction counsel).  Under 18 U.S.C. § 3006A(a)(2)(B), the Court may appoint counsel for an indigent litigant seeking relief under 28 U.S.C. § 2255, but such requests are discretionary when "due process or the 'interests of justice'" so require.  Hooks, 775 F.2d at 1438; Norris v. Wainwright, 588 F.2d 130, 133 (5th Cir. 1979); see also 28 U.S.C. § 2255(g) and Rule 8(c) of the Rules Governing Section 2255 Cases in the United States District Courts (authorizing appointment of counsel pursuant to 18 U.S.C. § 3006A).  Moreover, appointment of counsel is "a privilege that is justified only by exceptional circumstances[.]"  McCall v. Cook, 495 F. App'x 29, 31 (11th Cir. 2012).  The Court finds no exceptional circumstances warranting the appoint of counsel and, therefore, **DENIES** Hatterer's Motion to Appoint Counsel, (doc. 775).

Further, Hatterer is not entitled to an evidentiary hearing.  Hatterer has the burden of establishing the need for an evidentiary hearing.  Birt v. Montgomery, 725 F.2d 587, 591 (11th Cir. 1984).  She would be entitled to a hearing only if her allegations, if proved, would establish her right to collateral relief.  Townsend v. Sain, 372 U.S. 293, 307 (1963).  "Under Rules Governing Section 2255 Cases, Rule 4(b), a district court faced with a 2255 motion may make an order for its summary dismissal "[i]f it plainly appears from the face of the motion and any annexed exhibits and the prior proceedings in the case that the movant is not entitled to relief[.]"  Broadwater v. United States, 292 F.3d 1302, 1303 (11th Cir. 2002).  Accordingly, no hearing is required when the record establishes that a Section 2255 claim lacks merit.  United States v. Lagrone, 727 F.2d 1037, 1038 (11th Cir. 1984).  Additionally, the Court need not hold a hearing where the record reveals the claim is defaulted.  McCleskey v. Zant, 499 U.S. 467, 494 (1991).  Hatterer has not established any basis for an evidentiary hearing because the record reveals that all the issues she raises either lack merit or are procedurally defaulted, waived, or barred.

[4]  In this Order, the Court discusses several confidential matters which, having weighed all due considerations, the Court finds should not be a part of the public record.  Thus, the Court will issue two versions of this Order, one version that redacts all confidential matters which shall be filed on the public docket and another version that includes all confidential matters that the Clerk of Court shall file as an attachment to the redacted version **UNDER SEAL** in a restricted manner whereby only Hatterer,

# BACKGROUND

## I. THE INDICTMENT AGAINST HATTERER

On May 7, 2019, the grand jury for this District returned a thirty–count Indictment against Hatterer and seventeen codefendants.  (Doc. 4.)  The grand jury charged Hatterer with one count of conspiracy to possess with intent to distribute and to distribute fifty grams or more of methamphetamine in violation of 21 U.S.C. § 846 (Count One), four counts of possession with intent to distribute more than five grams of methamphetamine in violation of 21 U.S.C. § 841(a)(1) (Counts Five, Six, Seven, and Eight), two counts of possession of firearms in furtherance of a drug trafficking crime in violation of 18 U.S.C. § 924(c) (Counts Nine and Thirteen), one count of possession with intent to distribute more than fifty grams of methamphetamine in violation of 21 U.S.C. § 841(a)(1) (Count Twelve), and two counts of possession of a firearm by a convicted felon in violation of 18 U.S.C. § 922(g)(1) (Counts Eight and Fourteen).  (Id.)  The Government asserted in its Penalty Certification that Hatterer faced not less than ten years' imprisonment nor more than life imprisonment as to Counts One and Twelve; not less than five years' imprisonment nor more than forty years' imprisonment as to Counts Five, Six, Seven, and Eight; not less than five years' imprisonment nor more than life imprisonment consecutive to any other sentence  as to Counts Nine and Thirteen; and up to ten years' imprisonment as to Counts Eight and Fourteen.  (Doc. 5.)  The Court notified Hatterer of the charges against her, the maximum penalties that she could face on the charges, and her rights regarding the charges at her arraignment on May 31, 2019.  (Doc. 136.)

---

Hatterer's prior counsel, and counsel for the United States have access to the document.  The Clerk of Court shall mail both the redacted and unredacted versions of the Order to Hatterer at her last know address.  Given the confidential information in the unredacted version, the Clerk of Court shall print on the outside of the envelope: **CONFIDENTIAL LEGAL MAIL TO BE OPENED ONLY BY TINA HATTERER BY ORDER OF UNITED STATES DISTRICT JUDGE R. STAN BAKER**.  Ms. Hatterer shall be responsible for maintaining the confidence of the unredacted version.

## II.   HATTERER'S CHANGE OF PLEA

Hatterer and her attorney, Mr. Andrew S. Johnson, were able to negotiate a plea agreement with the Government whereby Hatterer agreed to plead guilty to Count One, the charge of conspiracy to possess with intent to distribute and to distribute more than fifty grams of methamphetamine, and Count Thirteen, one of the charges of possession of a firearm in furtherance of a drug trafficking crime.  (Doc. 283.)  The plea agreement laid out Hatterer's offense conduct and the factual basis for her guilty plea.  (Id. at pp. 1–3.)  It also set forth the mandatory minimum and maximum sentences associated with Counts One and Thirteen.  (Id. at p. 3.)  The agreement contained a cooperation provision that did not require Hatterer to cooperate but made clear that if she chose to cooperate she would have to provide full, candid, and truthful cooperation in the investigation and prosecution of the crimes charged in the Indictment and any related crimes.  (Id. at pp. 6–7.)  Through the plea agreement, Hatterer agreed to waive her rights to appeal and to collaterally attack her convictions and sentence with limited exceptions.  (Id. at pp. 9–10.)  Hatterer also stated that she "has had the benefit of legal counsel in negotiating this agreement.  Defendant believes that her attorney has represented her faithfully, skillfully, and diligently, and she is completely satisfied with the legal advice given and the work performed by her attorney."  (Id. at p. 11.)

On July 15, 2019, Hatterer appeared before the Court for a change of plea, or Rule 11, proceeding.  (Doc. 276.)  At the hearing, the Court engaged in an extensive plea colloquy with Hatterer that lasted approximately fifty minutes.  (Doc. 771.)  At the beginning of the hearing, the Court reviewed all the charges levied against Hatterer in the Indictment, and she confirmed that she was notified of the charges against her, the maximum penalty that she could face on those charges, and her rights regarding those charges at her arraignment.  (Id. at pp. 3—4.)  The

Court inquired as to whether it was Hatter's intention to plead guilty to Count One and Count Thirteen of the Indictment pursuant to her plea agreement, and she stated that it was.  (<u>Id.</u> at p. 4.)  The Court asked whether anyone was forcing or making her plead guilty at all, and she stated that no one was doing so.  (<u>Id.</u>)  The Court then explained to Hatterer that the Court wanted to be certain she understood everything that was said during the hearing and asked her to interrupt the Court and ask for clarification if she did not understand anything that the Court or anyone else said during the hearing.  (<u>Id.</u> at pp. 4—5.)  She stated that she would do so.  (<u>Id.</u> at p. 5.)  The Court also encouraged her to rely upon Mr. Johnson throughout the hearing and to let the Court know if she had a question for him or otherwise wanted to speak with him at any point, and Hatterer stated that she would.  (<u>Id.</u> at p. 5.)  The Court explained to Hatterer that her decision to plead guilty was an "extremely important" one, and the Court could only accept her decision if it was knowingly, voluntarily, and intelligently made, and Hatterer affirmed that she understood.  (<u>Id.</u>)  The Court stated that it would ask her a series of questions during the hearing but that she should not take anything the Court stated as weighing in one way or the other on her decision to plead guilty as that decision was solely her choice, and Hatterer indicated that she understood.  (<u>Id.</u> at pp. 5—6.)  Hatterer stated that neither her lawyer nor anyone else was making her or requiring her to plead guilty.  (<u>Id.</u> at p. 6.)

The Court had Hatterer placed under oath before asking her a series of questions.  (<u>Id.</u>)  The Court explained to Hatterer that if she did not tell the truth after she was placed under oath that she could be prosecuted for perjury, and she indicated that she understood.  (<u>Id.</u>)

Upon questioning by the Court, Hatterer was able to recount her personal information. She stated her age, the last four digits of her social security number, her place of birth, her marital status including how long she had been married, the age of her child, her and her child's

place of residence, Hatterer's educational background including where she had gone to school, her employment history, and her medical history. (Id. at pp. 6—9.)  The Court had the following exchange with Hatterer:

> Q.    Are you currently or have you recently been under the care of a physician or psychologist?
>
> A.    Yes, sir.
>
> Q.    What have you been treated for recently?
>
> A.    PTSD, schizophrenic, bipolar with psychotic features, and manic depression.
>
> Q.    Those mental health conditions and psychological conditions that you've been treated for recently, are you suffering from any of those conditions or the acute symptoms of any of those conditions today?
>
> A.    No, sir.
>
> Q.    Are those conditions currently affecting your ability to think today as you stand here right now?
>
> A.    No, sir.
>
> Q.    Are you able to understand the things that I'm telling you today?
>
> A.    Yes, sir.
>
> Q.    Are you suffering from any kind of psychological side effects of any kind today at all?
>
> A.    No, sir.
>
> Q.    All right. Well, if you have any difficulty at any point in time during this hearing, you let me know that. Okay?
>
> A.    Yes, sir.
>
> Q.    Are you taking medication for those conditions currently?
>
> A.    Yes, sir.
>
> Q.    And are those medications helping keep those conditions under control?

A.      I'm -- yes. Yes, sir.

Q.      Are those medications making it easier for you to think today?

A.      Yeah. I mean I'm just numb.

Q.      Okay. Well, you say you're just numb, but are you able to think clearly today?

A.      Yes, sir. Yes, sir.

Q.      Okay. And are you able to make important decisions today?

A.      Yes, sir.

Q.      Would you feel comfortable -- the mental health state that you're being in today, would you feel comfortable making one of your most important life decisions?

A.      Yes, sir.

Q.      Okay. Because that's what you're doing today. You understand that?

A.      Yes, sir.

Q.      If at any point in time you don't feel comfortable, you feel like you don't have the mental capacity to make any decision, you let me know. Okay?

A.      Yes, sir.

(Id. at pp. 9—10.)   The Court then asked Mr. Johnson if he had any reasons to question

Hatterer's competence, and he stated that he did not.  The Court then stated:

THE COURT: I don't either. Though Ms. Hatterer tells me that she has suffered from some psychological illnesses and mental illnesses during her life, she doesn't appear to me to be suffering from any of those conditions today to the point that would prevent her from understanding the information that I'm giving her, and it certainly doesn't appear that she doesn't have the ability to make an important decision today. I trust her at what she's just told me is that she can think clearly and she can make important decisions. Is all that correct, ma'am?

THE DEFENDANT: Yes, sir.

THE COURT: Also, not only by her answers that she's given me, but also by her demeanor in the courtroom, she's competent and able to make important decisions. Correct, ma'am?

THE DEFENDANT: Yes, sir.

(Id. at p. 11.)

The Court explained to Hatterer the difference between a plea of guilty and a plea of not guilty, and she stated that she understood. (Id. at p. 12.) The Court stated that she was presumed innocent and then described the meaning of that presumption, and she stated that she understood. (Id.) The Court told her that the Indictment against her was not evidence of her guilt, and she stated that she understood. (Id.) The Court also explained that she did not have to plead guilty and that she had the right to maintain a plea of not guilty. (Id. at p. 13.) The Court further advised Hatterer that if she chose to persist in her not guilty plea, she would have the right to a public and speedy trial by jury, a presumption of innocence during that trial, and the assistance of counsel through every phase of the case. (Id.) The Court told Hatterer that if she went to trial, she would have the right to see and hear all of the Government's witnesses and have her attorney cross-examine those witnesses. (Id.) The Court explained that she would have the right at trial to testify herself or remain silent, and she stated that she understood. (Id.) The Court also explained that she would have the right to compel the attendance of witnesses and the production of documents at trial and to offer those in her defense, and she stated that she understood. (Id. at pp. 13—14.) The Court also told Hatterer that if she went to trial and chose not to testify or not to call any witnesses, no one could use those decisions against her. (Id. at p. 14.) The Court cautioned Hatterer that if she plead guilty there would not be a trial and that she would be waiving those trial rights if she pleaded guilty. (Id.) Hatterer testified that she understood her

rights and that she had no questions regarding the rights that she would be giving up by pleading guilty or her trial rights at all.  (Id.)

       The Court also explained to Hatterer that she had a right to an attorney to help her and to represent her at every stage of the case, that the Court had appointed Mr. Johnson to represent her, and that he would continue to represent her regardless of whether she decided to plead guilty or maintain her plea of not guilty.  (Id. at pp. 14—15.)  Hatterer stated that she understood.  (Id. at p. 15.)  The Court asked Hatterer if there was anything about her relationship with Mr. Johnson that was influencing or affecting her decision to plead guilty, and she stated that there was not.  (Id.)  Hatterer stated that she had an adequate opportunity to meet with Mr. Johnson before deciding to plead guilty, and that "today would probably be about the sixth or seventh time I've seen him."  (Id.)  Mr. Johnson confirmed that statement.  (Id.)  Hatterer confirmed that Mr. Johnson had reviewed with her the discovery that the Government had produced regarding the charges against her, that he had explained to her the rights that she had including her right to trial and any defenses that he would present if the case went to trial, that Mr. Johnson had gone over her case with Hatterer, and permitted her to go over her case with him, that he had permitted her to give him her viewpoints about the case, that he had given her his viewpoints, that he had explained the procedures that were to take place including the Rule 11 procedure, and that he had discussed the federal sentencing system with her including the United States Sentencing Guidelines.  (Id. at pp. 15—16.)  Hatterer testified that she was satisfied with Mr. Johnson's representation and advice and that she had no complaints about Mr. Johnson whatsoever.  (Id. at p. 16.)

The Court explained to Hatterer that it wanted to be certain that she understood the charges against her in the Indictment, and she stated that she understood what she had been charged with and what the Government would have to prove for her to be found guilty of those charges. (Id. at p. 17.) The Court reviewed Counts One and Thirteen of the Indictment with Hatterer and discussed the essential elements of those crimes. (Id.) Before reviewing the specific elements of Counts One and Thirteen with her, the Court explained that by "elements" the Court meant what the Government would have to prove if the case went to trial in order for her to be found guilty but also what Hatterer would be admitting if she pleaded guilty. (Id.) Hatterer responded that she understood. (Id.) The Court reviewed each of the specific elements of Counts One and Thirteen with Hatterer, and she stated that she understood those elements and that she had no questions about them at all. (Id. at pp. 17—18.) As to Count Thirteen, the Court explained that the Government would have to prove first that she committed the drug trafficking crime alleged in Count Twelve of the Indictment and second that she possessed a firearm in furtherance of that drug trafficking crime. (Id. at p. 18.) Hatter testified that she understood and that she had no questions about those elements. (Id.)

The Court advised Hatterer of the process it would follow to determine her sentence, including the preparation of a Presentence Investigation Report ("PSI") by the United States Probation Office, and Hatterer affirmed that she understood that process. (Id.) The Court advised Hatterer of statutory penalties associated with Counts One and Thirteen. (Id. at pp. 18—19.) The Court specifically explained that Count One carried a mandatory minimum of ten years' imprisonment up to a maximum term of life imprisonment. (Id.) The Court explained that Count One carried a "mandatory minimum" sentence and specifically asked Hatterer if she

understood what that means.  She stated that she did and that she had no questions about that at all.  The Court told Hatterer,

> Q.      So the least sentence you could ever get on Count 1 if you're found guilty of that by guilty plea or conviction is 10 years. Do you understand?
>
> A.      Yes, sir.
>
> Q.      Okay.  Or by guilty plea or by trial. Do you understand?
>
> A.      Yes, sir.

(Id. at p. 19.)  The Court then advised Hatterer,

> Q:      Count 13, [the statutory penalty] is imprisonment of not more than life, but not less than five years and consecutive to any other sentence.  Do you understand that?
>
> A.      Yes, sir.
>
> Q.      Do you understand that that also has a mandatory minimum sentence?  Do you understand that?
>
> A.      Yes, sir.
>
> Q.      And that mandatory minimum being five years.  Any questions about that at all?
>
> A.      No, sir.
>
> Q.      And do you understand what the word consecutive means?
>
> A.      Yes, sir.
>
> Q.      That means it would have to run after any other sentence that you get. Do you understand that?
>
> A.      Yes, sir.

(Id. at pp. 19—20.)  Hatterer stated that she had no questions about the statutory penalties, including the minimum and maximum penalties, that she could face.  (Id. at p. 20.)

Moreover, the Court explained to Hatterer that, in imposing a sentence upon her, it would have to take into consideration the advisory Sentencing Guidelines and the factors set forth in 18 U.S.C. § 3553, and the Court outlined the factors it would consider at sentencing. (Id. at pp. 20—21.) Hatterer affirmed that she and Mr. Johnson had discussed the Guidelines and the factors that could affect her sentence. (Id. at pp. 21—22.) The Court explained that no one could predict her sentence, that all that anyone could give her is a "best guess" or "estimate" of what her Guidelines' range and sentence would be, and that such an estimate would in no way bind the Court, and Hatterer stated that she understood. (Id. at p. 22.) She testified that no one had promised her an exact sentence or made any guarantees to her about what sentence she would receive. (Id.) The Court told Hatterer that if she pleaded guilty, the Court could sentence her to the maximum extent allowed by law just as if she had gone to trial and been found guilty of the charges to which she pleaded guilty. (Id.) Hatterer stated that she understood, and she also testified that she understood that if she received a sentence that was lengthier than the sentence she thought she was going to receive, that would not be grounds for withdrawing her guilty plea. (Id.)

After discussing supervised release, the lack of parole, and other consequences of her guilty plea with Hatterer, the Court asked her if she understood everything that the Court had stated up to that point in the hearing, and she said that she did. (Id. at p. 24.) The Court asked whether she had any questions for the Court or Mr. Johnson, and she stated that she did not. (Id. at pp. 24—25.)

The Court then affirmed with Hatterer that she had given Mr. Johnson permission to negotiate a plea agreement with the Government, and that Mr. Johnson had gone over the plea agreement with her before she signed it. (Id. at p. 25.) The Court then asked the Assistant

United States Attorney ("AUSA") to summarize the provisions of the plea agreement, and the Court told Hatterer to "listen very carefully" to that summary so that Hatterer could tell the Court if the AUSA misstated anything. (Id.) The AUSA explained the plea agreement's terms and confirmed with Hatterer that her signature was on the plea agreement presented by the Government, and that she had initialed every page of the plea agreement. (Id. at pp. 25—27.) The Court asked Hatterer if the AUSA's summarization of the plea agreement was consistent with the plea agreement she signed, and Hatterer stated it was. (Id. at p. 28.) Hatterer also confirmed that the plea agreement that the AUSA presented was the plea agreement that she reviewed with her attorney and signed, that she read "every word" of the plea agreement before she signed it, that her lawyer answered any questions she might have about the plea agreement before she signed it, that she was confident that she understood what the plea agreement said and what it meant, and that she understood that by initialing and signing the plea agreement, she was agreeing to be bound by all of its terms and agreeing that all the facts contained in the agreement were true and accurate. (Id. at pp. 27—29.)

The Court then specifically addressed the direct appeal waiver and the collateral attack waiver in the plea agreement with Hatterer. (Id. at pp. 29—30.) Hatterer stated that she understood those waivers and understood that she would not be able to contest her conviction and sentence even if she was unhappy with it. (Id.) The Court specifically explained that the exceptions to the direct appeal waiver were (1) if the Court were to sentence her above the statutory maximum, (2) if the Court were to sentence her above the advisory guideline range as found by the Court; and (3) if the Government were to file a direct appeal, and the Court stated that other than those instances, Hatterer could not file an appeal. (Id. at p. 30.) Hatterer testified that she understood. (Id.) Next, the Court specifically reviewed the plea agreement's waiver of

collateral attack rights with Hatterer and explained that the only exception to that waiver was a collateral attack based on ineffective assistance of counsel.  (Id.)  Hatterer testified that she understood.  (Id.)  Hatterer answered that she wanted to waive her direct appeal and collateral attack rights with those limited exceptions as part of her plea bargain and that she had sufficient information about those rights to waive them.  (Id.)  Hatterer then once again stated that she understood everything that the Court had discussed with her up to that point in the hearing and that she had no questions.  (Id.)

The Court then called upon the AUSA to proffer a factual basis for the guilty plea.  (Id. at p. 31.)  The Court told Hatterer, "listen carefully to [the AUSA], because at the conclusion of her summary I'm going to ask you if you disagree with anything that she says."  (Id.)  The AUSA then explained that the charges against Hatterer resulted from a multi–agency investigation into Hatterer and her coconspirators and that the investigation revealed that Hatterer had formed a conspiracy that began in November 2017 and continued until the return of the indictment to distribute large quantities of methamphetamine and marijuana throughout the Southern District of Georgia.  (Id. at pp. 31—32.)  The investigation seized controlled substances and firearms which were possessed in furtherance of the drug trafficking activities.  (Id. at p. 32.)  The AUSA laid out the following sales of methamphetamine that Hatterer conducted: on November 9, 2018, Hatter sold 6.021 grams of methamphetamine to a confidential informant; on November 13, 2018, Hatterer sold 16.375 grams of methamphetamine to a confidential informant; on November 14, 2018, Hatterer sold 11.774 grams of methamphetamine and a revolver to a confidential information; on November 20, 2018, Hatter and codefendant Deena Parker sold 6.469 grams of methamphetamine to a confidential information.  (Id. at pp. 32—33.)  The AUSA proffered that, after this last sale, law enforcement conducted a traffic stop of the vehicle that

Hatterer was driving and the subsequent search of the vehicle revealed that Hatterer was in possession of 52.27 grams of methamphetamine, an additional 7 grams were found in Parker's purse, and .38 special revolver was also discovered in the vehicle in Hatterer's possession. (Id.) The AUSA stated that Hatterer had purchased the revolver from a codefendant, that Hatterer had made at least two trips to Atlanta with another codefendant to purchase methamphetamine, and that she purchased at least ten ounces (283.5 grams) of methamphetamine from a codefendant. The Court directly asked Hatterer if she "disagree[d] with anything" that the AUSA had stated in the factual proffer, and Hatterer stated that she did not. (Id. at pp. 33—34.)

The Court then asked Hatterer to tell the Court in her own words what she had done, and Hatterer stated, "I went to Atlanta and purchased methamphetamines with me and [codefendant] Bayleigh [Laughing] and Tattoo and bagged it up and resold it and purchased a gun as well from Tattoo, Robert Jennings." (Id. at p. 34.) Upon questioning by the Court, Hatterer admitted that she participated in a conspiracy to distribute the drugs she had purchased and that the drugs that were distributed in the conspiracy exceeded fifty grams of methamphetamine. (Id.) Then the Court asked Hatterer whether she possessed the firearm in furtherance of a drug trafficking crime, and Hatterer asked, "Does that mean like when I got pulled over I had it?" (Id.) The Court then stated to Hatterer that it would explain to her what it meant to possess a firearm in furtherance of a drug trafficking crime. (Id.at pp. 34—35.) The Court explained to Hatterer that "possessing a firearm in furtherance of a drug crime means that the firearm, helped, promoted, or advanced the crime in some way." (Id. at p. 35.) The Court then asked Hatterer if she now better understood what it meant to possess a firearm in furtherance of a drug trafficking crime, and she stated that she did. (Id.) The Court then asked Hatterer if she agreed that she possessed a firearm in furtherance of the drug trafficking crime charged in Count Twelve of the Indictment,

and she stated that she did.  (Id.)  The Court asked Hatterer if "she had any further questions about what it means to possess a firearm in furtherance of a drug trafficking crime," and she responded that she did not. (Id.)  The Court asked if she need to talk to her attorney about the topic, and she stated that she did not.  (Id.at pp. 35—36.)  The AUSA then proffered to the Court that Hatterer had admitted to law enforcement "that she used the firearm for protection, which would go into that -- go into the drug trafficking." (Id. at p. 36.)  The Court asked Hatterer if that statement was accurate, and Hatterer testified that it was.  (Id.)

Hatterer confirmed that other than the promises and representations contained in her plea agreement, she was not relying on any other promise or representation in deciding to plead guilty.  (Id. at p. 36.)  She said that no one had threatened, pressured, forced, or intimidated her or someone close to her to get her to give up her rights and plead guilty.  (Id. at pp. 36—37.)  She testified that no one had leaned on her, bribed her, or promised her anything to get her to enter a guilty plea.  (Id. at p. 37.)  Hatterer stated that her guilty plea was voluntary and of her own free will, that she was pleading guilty because she was in fact guilty of committing the crimes, that she understood the elements of the crimes to which she was pleading guilty, and that she was confident that her conduct would establish the essential elements of the crimes.  (Id. at p. 37.)  She also stated that she had fully discussed her case with her lawyer and that she was satisfied with the services that her lawyer had rendered in her case.  (Id. at pp. 37—38.)

Hatterer then pleaded guilty to Counts One and Thirteen. (Id. at p. 38.)  The Court stated,

I find that you're competent, that you fully understand these charges. I find that there's a factual basis for your plea of guilty. I find that you know the maximum and minimum punishments that you face on these charges. You know your jury rights. You've knowingly and voluntarily waived those rights.  Your decision to plead guilty is voluntary and knowing and not the result of any force, pressure, threats or promises, other than the promises made by the government in the plea agreement.  Is all of that correct, ma'am?

(<u>Id.</u> at p. 38.)  Hatterer responded, "Yes, sir."  (<u>Id.</u>)  Therefore, the Court accepted Hatterer's plea and adjudged her guilty of Counts One and Thirteen of the Indictment.

At the conclusion of the Rule 11 hearing, the Court advised Hatterer that the United States Probation Office would prepare a PSI.  (<u>Id.</u> at p. 39.)  The Court explained that the probation officer would conduct an interview of Hatterer as part of the presentence investigation process, that interview was an important part of the case, and that she had the right for her attorney to be present during that interview.  (<u>Id.</u>)  The Court explained that once the PSI was drafted, she should review the PSI carefully with her attorney, that she should "read every single word of it" and that if she had any disagreement with anything in the PSI, she should let Mr. Johnson know and he could file an objection on her behalf.  (<u>Id.</u> at p. 40.)  At the conclusion of the hearing, the Court asked Hatterer if she had any questions about anything that had been done during the hearing, and she responded that she did not.  (<u>Id.</u> at p. 47.)

## III.   HATTERER'S SENTENCING

Prior to Hatterer's sentencing hearing, the United States Probation Office drafted an initial PSI.  (Doc. 392).  Mr. Johnson filed a response indicating that Hatterer had no objections to the initial PSI, (doc. 400), and the final PSI was filed shortly thereafter, (doc. 411).  The PSI laid out Hatterer's offense conduct and criminal history and calculated Hatterer's advisory Guidelines' range.  (<u>Id.</u>)  The PSI detailed Hatterer's significant role in the operation of a substantial drug trafficking conspiracy.  (<u>Id.</u> at ¶¶ 5–17.)  The evidence against Hatterer outlined in the PSI was extensive and damning and included numerous controlled purchases, statements of coconspirators, as well as at least two searches of vehicles that Hatterer occupied that uncovered substantial quantities of drugs and at least two firearms.  (<u>Id.</u>)  Perhaps most inculpatory were Hatterer's own statements to a special agent of the Bureau of Alcohol and

Firearms directly following her November 20, 2018 arrest.  (<u>Id.</u> at ¶¶ 11—13.)  Hatterer told the agent that her occupation was "selling drugs," and she gave a very detailed statement of her history of selling large quantities of marijuana, heroin, and methamphetamine.  (<u>Id.</u>)  The PSI also stated that on November 20, 2018, directly after Hatterer sold over 6 grams of methamphetamine to a confidential informant at a gas station, officers conducted a traffic stop on the car that Hatterer was driving and that "[a] search of the vehicle yielded an Amadeo Rossi, Model .38 Special, .38 caliber revolver loaded with 14 rounds of ammunition under the driver's seat in which Hatterer was seated.  The center console of the vehicle contained 52.27 grams of methamphetamine (mixture)."  (<u>Id.</u> at ¶ 10.)  Hatterer's PSI was replete with statements that she possessed firearms during drug transactions and that she sold and purchased firearms along with methamphetamine.  (<u>Id.</u> at ¶ ¶ 7, 10, 12, 14, 20.)   Additionally, during the presentence investigation, Hatterer told the Probation Officer that she possessed a firearm for protection even though she knew she was not supposed to possess it.  (<u>Id.</u> at ¶ 20.)

The Probation Officer determined that for the purposes of the Sentencing Guidelines, Hatterer "should be conservatively attributed with 623.7 grams of methamphetamine (mixture). This amount is comprised of the methamphetamine Hatterer admitted to agents that she bought." (<u>Id.</u> at ¶ 19.)  Under U.S.S.G. § 2D1.1(c)(5), Hatterer's base offense level for Count One, the conspiracy offense, was thirty.  (<u>Id.</u> at ¶ 23.)   However, Hatterer's total offense level on Count One was reduced by three levels due to her acceptance of responsibility.  (<u>Id.</u> at ¶¶ 30—32.) Thus, her total offense level as to Count One was twenty–seven.  (<u>Id.</u> at ¶ 32.)  Hatterer had several prior criminal convictions dating back to 2001, though only three of those convictions garnered criminal history points.  (<u>Id.</u> at ¶¶ 34—48.)  She scored eight criminal history points for a Guidelines criminal history category of IV.  (<u>Id.</u> at ¶ 49.)   Her total offense level of 27

combined with a criminal history category of IV resulted in Guideline range of 120 months (the statutory minimum) to 125 months as to Count One, the conspiracy count.  (Id. ¶ 76.)  Pursuant to U.S.S.G. § 2K2.4(b), the recommended Guideline sentence for Count Thirteen, the possession of a firearm in furtherance of a drug trafficking crime count, was the mandatory minimum sentence, sixty months, consecutive to the sentence for Count One.  (Id. at ¶¶ 22, 75, 76.)  The PSI also explained that Hatterer had a history of several psychological illnesses including personality disorder, schizoaffective disorder, and bipolar I disorder with psychotic features.  (Id. at ¶¶ 65—66.)  Furthermore, the PSI detailed Hatterer's exceedingly difficult childhood including sexual, physical, and psychological abuse.  (Id. at ¶¶ 58—60.)

███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
██████████████████████████████

Hatterer appeared before the Court for sentencing on November 7, 2019.  (Doc. 432.)  At the beginning of the sentencing hearing, the Court asked the AUSA and Mr. Johnson independently if they had the opportunity to read the PSI and if they had any objections to it. (Doc. 772, pp. 4—5.)  Counsel each confirmed that they had read the PSI and discussed it with their respective clients and that they had no objections.   (Id.)  The Court had the following colloquy with Hatterer:

THE COURT: Ms. Hatterer, have you had a chance to go over this presentence investigation report with Mr. Johnson?

THE DEFENDANT:  Yes, sir.

THE COURT: Did you read every word of it?

THE DEFENDANT:  Yes, sir.

THE COURT: Do you disagree with anything in there?

THE DEFENDANT:  No, sir.

(Id. at p. 4.)  The Court then stated that it had read the PSI and concurred with all of its facts and conclusions, and the Court announced the PSI's Guidelines calculations as the findings of the Court.  (Id. at p. 5.)



████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████

The AUSA offered oral argument regarding Hatterer's sentence which focused on the seriousness of her offense but also acknowledged that she had accepted responsibility for her actions and that she had an extremely difficult childhood.  (Doc. 772, pp. 6—8.)  Upon questioning from the Court, the AUSA acknowledged that Hatterer's extensive criminal history appeared to the history of someone who was addicted to drugs and that she has no convictions for charges of violence.  (Id. at pp. 8—9.)

Mr. Johnson began his sentencing argument by stating, "Your Honor, counsel from the government stated a lot of the same things that I was going to say.  He may have put a different spin on them, obviously.  But my client started off life below the bottom rung of the ladder, and she's never really gotten back up."  (Id. at p. 9.)  Mr. Johnson then sought to minimize Hatterer's criminal history by stressing that it did not involve any violent offenses and that she had never received a significant sentence.  (Id. at pp. 9—11.)  He also stressed that she had only recently been involved with methamphetamine, that she had accepted responsibility for her actions.  (Id. at pp. 10—11.)  Mr. Johnson stated, "[g]iven her history, Your Honor, I think a sentence of five years in the federal penitentiary where she's going to be given some kind of treatment, some kind of job skills, will do a lot in terms of, number one, preventing my client from committing these types of offenses in the future, to maybe actually allow her to be a beneficial member of society

for the first time in her life." (Id. at p. 11.)  Ms. Hatterer then provided an allocution to the Court during which she stressed that she had a horrible childhood, that her criminal history was a result of her addiction, that she only dealt methamphetamine for four months, and that she wants to use her time in the federal penitentiary to improve her life.  (Id. at p. 12.)

The Court stated that it has considered all of the information in the case including the PSI, counsel's arguments, Hatterer's statements, and the matters discussed at sidebar.  (Id. at p. 12—13.)  Based on all the information and in consideration of the Section 3553 factors, the Court pronounced a sentence of 120 months' imprisonment, consisting of sixty months as to Count One, and sixty months as to Count Thirteen.  (Id. at p. 13.)  The Court explained that it had departed and varied downward from the advisory Guidelines' range based firstly on the matters discussed at sidebar and "[s]econdly, because of the defendant's history and characteristics, in the sense that, while it is not an excuse for her actions, she had a horrible, horrible beginning to her life that obviously put her in a position less advantageous than your normal member of the public." (Id.)  Pursuant to the plea agreement, the Court dismissed the other charges of the Indictment pending against Hatterer.  (Id. at p. 17.)  The Court advised Hatterer that she had waived her right to appeal with limited exceptions, pursuant to her plea agreement, but advised that, if she wished to file an appeal, she must do so within fourteen days of the date of sentencing. (Id. at p. 18.)  The Court explained that Hatterer had a right for appointed counsel to represent her on appeal and that she could even request for the Clerk of Court could file a notice of appeal on her behalf.  (Id. at pp. 18—19.)  The Court advised Mr. Johnson to review the notice of post-conviction obligation form with Hatterer and then to file it with the Court.  (Id. at p. 19.)  The Court lectured and encouraged Hatterer at length, including explaining to her that her possession of a firearm while dealing drugs was dangerous and

abhorrent conduct and that she obviously had made bad decisions in her life, but that the sentence the Court had given her was designed to help her make better decisions and to have a better life moving forward, and the Court wished her the best of luck.  (Id. at pp. 19—21.)

On November 12, 2019, Mr. Johnson filed a post–conviction consultation certification signed by him and Hatterer.  (Doc. 441.)  Through the certification, Hatterer and Mr. Johnson certified that they had fully discussed Hatterer's rights to appeal and that Hatterer had decided not to file an appeal.  (Id.)  The certification stated that Mr. Johnson had explained to Hatterer the consequences of not filing an appeal that those consequences "include the waiver of [her] right to complain about the process that led up to [her] conviction, including in the future, should [she] decide to seek any form of habeas corpus, 28 U.S.C. § 2255, or other judicial relief from the conviction."  (Id.)  Consistent with this certification, Mr. Johnson did not file a Notice of Appeal.

## III.   HATTERER'S POST-SENTENCE FILINGS

On February 25, 2020, Hatterer filed a Motion to Modify Sentence.  (Doc. 647.)  She generally claimed that Mr. Johnson rushed her into signing her plea agreement, that he did not show her discovery materials, and she had a history of mental illness.  (Doc. 647–1.)  The Government responded in opposition to Hatterer's Motion and stated that the Court should notify Hatterer that it may construe her Motion as being made pursuant to 28 U.S.C. § 2255. (Doc. 651.)  The Court subsequently issued an order pursuant See Castro v. United States, 540 U.S. 375, 383 (2003), directing Hatterer to make her election as to whether she would like the Court to rule on her motion as filed, amend her motion, or withdraw her motion.  (Doc. 674.) Shortly thereafter, Hatterer filed a letter indicating that she would like to amend her Motion but that she was gathering materials to do so.  (Doc. 678.)  Then, on September 16, 2020, Hatterer

24

filed a Motion Under 28 U.S.C. § 2225 to Vacate, Set Aside, or Correct Sentence by Person in Federal Custody ,(doc. 693), and a Motion to Challenge District Court's Ruling on 18 U.S.C. § 924(c), (doc. 694).   At the same time, Hatterer filed a Motion for Compassionate Release, (doc. 692), which the Court denied, (doc. 718), and she later filed a Motion seeking a reduction in her sentence pursuant to the First Step Act, (doc. 733), which the Court dismissed, (doc. 758).

## DISCUSSION

The Court has reviewed the entirety of Hatterer's pleadings and construed her Section 2255 Motion liberally.   In these pleadings, Hatterer makes several arguments seeking to attack her conviction and sentence on Count Thirteen for possession of firearm in furtherance of a drug trafficking crime.   Additionally, she contends that Mr. Johnson rendered ineffective assistance of counsel in numerous areas.

A movant is not entitled to habeas relief "when [her] claims are merely conclusory allegations unsupported by specifics or contentions that in the face of the record are wholly incredible." Tejada v. Dugger, 941 F.2d 1551, 1559 (11th Cir. 1991).   "The allegations must be factual and specific, not conclusory.   Conclusory allegations are simply not enough to warrant a hearing." Chavez v. Sec'y Fla. Dep't of Corr., 647 F.3d 1057, 1061 (11th Cir. 2011) (citing San Martin v. McNeil, 633 F.3d 1257, 1271 (11th Cir. 2011)).   For a movant proceeding *pro se*, the court will liberally construe the pleading, but he or she "must suggest (even if inartfully) that there is at least some factual support for a claim; it is not enough just to invoke a legal theory devoid of any factual basis." Jones v. Fla. Parole Comm'n, 787 F.3d 1105, 1107 (11th Cir. 2015).   "An evidentiary hearing may be necessary where the material facts are in dispute, but a [movant] is not entitled to an evidentiary hearing when his claims are merely conclusory allegations unsupported by specifics." Pugh v. Smith, 465 F.3d 1295, 1300 (11th Cir. 2006)

(citations omitted).  Stated another way, "if a habeas petition does not allege enough specific facts, that if they were true, would warrant relief, the petitioner is not entitled to an evidentiary hearing." Chavez, 647 F.3d at 1060 (citing Allen v. Sec'y Fla. Dep't of Corr., 611 F.3d 740, 763 (11th Cir. 2010)).

Further, because solemn representations at a plea hearing by a defendant, her attorney, and the prosecutor "carry a strong presumption of verity" and "constitute a formidable barrier in subsequent collateral proceedings," a movant's later "presentation of conclusory allegations unsupported by specifics is subject to summary dismissal . . . ." Blackledge v. Allison, 431 U.S. 63, 73–74 (1977) (citing Machibroda v. United States, 368 U.S. 487, 495–96 (1962), and Price v. Johnston, 334 U.S. 266, 286–87 (1948)).  "[I]f the Rule 11 plea–taking procedure is careful and detailed, the defendant will not later be heard to contend that he swore falsely." United States v. Stitzer, 785 F.2d 1506, 1514 n.4 (11th Cir. 1986).  The statements of a defendant in open court are presumed to be true.  See United States v. Gonzalez–Mercado, 808 F.2d 796, 800 n.8 (11th Cir. 1987).  Thus, "[o]nly in the most extraordinary circumstances" will an evidentiary hearing be required to dispose of the later contention that statements made during the change of plea were untruthful." Blackledge, 431 U.S. at 80 n.19.

Hatterer's claims largely rely upon conclusory allegations that are refuted by the undisputed record evidenced in this case.  Even if Hatterer's statements in her pleadings were true, she is not entitled to relief.  Moreover, throughout her Section 2255 pleadings, Hatterer contradicts her own sworn statements from her change of plea hearing and her agreement with her PSI at the sentencing hearing.  Thus, the Court need not hold an evidentiary hearing on her motions, and the Court could easily dispose of her claims without a lengthy analysis.  Nonetheless, in the interest of completeness, the Court addresses each of Hatter's claims.  To the

extent this analysis does not address each of Hatterer's conclusory allegations, those arguments are nonetheless denied.

## I.   HATTERER'S ATTEMPT TO SET ASIDE HER SECTION 924(C) CONVICTION AND SENTENCE

As laid out in Background Section II above, during the Rule 11 hearing, the Court took careful measures to be certain that Hatterer understood what it meant to possess a firearm in furtherance of a drug trafficking crime as alleged in Count Thirteen of the Indictment. (Doc. 771, pp. 17—18; 34—36.)  The Court explained the elements of the charge and explained to Hatterer that if she pleaded guilty, she would be admitting to those elements.  (Id.)  Moreover, prior to the AUSA's proffer, the Court told Hatterer to listen carefully to what the AUSA stated and to let the Court know if she disagreed with anything in the proffer.  (Id. at p. 31.)  Then, following a proffer where the AUSA laid out damning evidence against Hatterer including her possession of a firearm while dealing a substantial quantity of drugs, Hatterer testified that she agreed with everything the AUSA stated.  (Id. at pp. 31—34.)  Then, after Hatterer testified to her wrongdoing in her own words, the Court told Hatterer that "possessing a firearm in furtherance of a drug crime means that the firearm, helped, promoted, or advanced the crime in some way." (Id. at p. 35.)  After this explanation, Hatterer stated that she better understood what it meant to possess a firearm in furtherance of a drug trafficking crime, admitted that she possessed a firearm in furtherance of the drug trafficking crime charged in Count Twelve of the Indictment, and stated that she had no further questions regarding what it meant to possess a firearm in furtherance of a drug trafficking crime and that she did not need to speak with her attorney any further about that issue.  (Id. at pp. 35—36.)  When the AUSA explained that Hatterer had told agents that she used the firearm for protection "which would go into that -- go into the drug trafficking," Hatterer testified that she agreed with that statement.  (Id. at p. 36.)

Additionally, the Court told Hatterer at the conclusion of the Rule 11 hearing to "read every single word of [the PSI]" and to let Mr. Johnson know if she disagreed with anything in the PSI so that he can file an objection on her behalf.  (Id. at p. 40.)  As detailed in Background Section III above, the PSI stated, among other things, that directly after Hatterer had sold over six grams of methamphetamine to a confidential informant at a gas station, law enforcement pulled over the car Hatterer was driving and discovered a revolver loaded with fourteen rounds of ammunition under the driver seat where Hatterer was seated and a substantial amount of methamphetamine (over 50 grams) in the car's adjacent center console.  (Doc. 411 at ¶¶ 5–17.)  Further, the PSI stated that Hatterer admitted to the probation officer that she possessed the firearm for protection.  (Id. at ¶ 20.)  At sentencing, Hatterer stated that she had read "every word" of the PSI and that she did not "disagree with anything in there."  (Doc. 772, p. 4.)

Hatterer now attempts to contradict her solemn declarations to the Court and backtrack on her acceptance of responsibility as to Count Thirteen.  Despite the overwhelming amount of evidence, including her own statements, that Hatterer possessed a firearm in furtherance of her drug trafficking activities, she now seeks to set aside her conviction on that charge.  She argues, (1) in her Motion to Modify Sentence that her sentence on Count Thirteen should run concurrently to her sentence on Count One, (doc. 647–1, p. 3); (2) in her Motion to Challenge District Court's Ruling on 18 U.S.C. § 924(c) that her conviction on Count Thirteen violates her rights under the Second Amendment to the United States Constitution and various rulings of the United States Supreme Court, (doc. 694); and (3) throughout her pleadings that her possession of the firearm was not in furtherance of a drug trafficking crime, (id. at p. 5; doc. 693, p. 8).  These arguments fail for the numerous reasons set forth below.

A.    **Hatterer's Plea Agreement's Collateral Attack Waiver Bars her Attack on her Section 924(c) Conviction and Sentence.**

As explained in Background Section II above, Hatterer's plea agreement contained a collateral attack waiver that stated, "Defendant entirely waivers her right to collaterally attack her conviction and sentence on any ground and by any method, including but not limited to a 28 U.S.C. § 2255 motion.   The only exception is that Defendant may collaterally attack her conviction and sentence based on a claim of ineffective assistance of counsel."   (Doc. 283, p. 10.)   It is well–settled that a waiver of appeal[5] and collateral attack provisions contained in a plea agreement are enforceable if the waivers are knowing and voluntary.   United States v. Johnson, 541 F.3d 1064, 1066 (11th Cir. 2008) (citing United States v. Weaver, 275 F.3d 1320, 1333 (11th Cir. 2001)).   "'To establish the waiver's validity, the government must show *either* that (1) the district court specifically questioned the defendant about the provision during the plea colloquy, or (2) it is manifestly clear from the record that the defendant fully understood the significance of the waiver.'"   United States v. Mottola, 394 F. App'x 567, 568 (11th Cir. 2010) (quoting United States v. Benitez–Zapata, 131 F.3d 1444, 1446 (11th Cir. 1997)).   "A waiver of the right to appeal includes a waiver of the right to appeal difficult or debatable legal issues— indeed, it includes a waiver of the right to appeal blatant error."   United States v. Howle, 166 F.3d 1166, 1169 (11th Cir. 1999).   "Waiver would be nearly meaningless if it included only those appeals that border on the frivolous."   Brown v. United States, 256 F. App'x 258, 261–62 (11th Cir. 2007).

As set forth in Background Section II above, the Court conducted an extensive colloquy with Hatterer that unquestionably established that she was pleading guilty knowingly and

---

[5]   "Appeal" refers to the right to appeal or contest, directly or collaterally, a sentence.   United States v. Bushert, 997 F.2d 1343, 1350 & n.17 (11th Cir. 1993).   Case law concerning waiver of a direct appeal has also been applied to waiver of the right to collateral proceedings.   Vaca-Ortiz v. United States, 320 F. Supp. 2d 1362, 1365–67 (N.D. Ga. 2004).

voluntarily and with the close assistance of counsel. (Doc. 771.) The Court reviewed her plea agreement with her even having her certify her signature and initials and having the AUSA summarize the agreement, and Hatterer confirmed the accuracy of that summary. (Id.at pp. 25—30.) Hatterer stated that she had authorized Mr. Johnson to negotiate the plea agreement on her behalf, that she had read every word of her plea agreement before she signed it, that Mr. Johnson had answered any questions that she might have about the plea agreement, and that she was confident that she understood what her plea agreement said and what it means. (Id.) Moreover, the Court took pains to explain the plea agreement's collateral attack waiver to Hatterer and she stated that she understood the waiver and that she wanted to waive her collateral attack rights with one limited exception as part of her plea bargain from the United States. (Id. at pp. 29—30.)

When a defendant enters a guilty plea during a Rule 11 proceeding, "there is a strong presumption that the statements made during the colloquy are true" and her plea is knowing and voluntary. Gonzalez–Mercado, 808 F.2d at 800 n.8. Moreover, it is "manifestly clear" from the record, including the extensive plea colloquy, the plea agreement itself, and the post–conviction consultation certification, that Hatterer fully understood the significance of her plea agreement's collateral attack waiver. Looking at the entirety of the record and taking Hatterer at her word during her Rule 11 hearing, she fully understood that she waived her collateral attack rights through her plea agreement as part of her plea bargain with the United States.

As Hatterer's collateral attack waiver was undoubtedly valid, the Court turns to the question of whether the waiver covers Hatterer's attack on her conviction and sentence on Count Thirteen. The only exception to Hatterer's collateral attack waiver is for claims of ineffective assistance of counsel. (Id. at p. 30; doc. 283, p. 10.) However, she is not attacking her

Section 424(c) conviction and sentence on grounds of ineffective assistance of counsel. Rather, she argues that Section 924(c) is unconstitutional, that Supreme Court precedent invalidates the conviction, that her sentence on Count Thirteen should run concurrent to her sentence on Count One, and that her possession of the firearm was not in furtherance of a drug trafficking crime. Accordingly, her attack on her conviction and sentence on Count Thirteen is barred by her collateral attack waiver. Thus, the Court **DENIES** this portion of her Section 2255 Motion.

### B.   Hatterer Procedurally Defaulted her Attack on her Section 924(c) Conviction and Sentence by not Filing a Direct Appeal.

Additionally, Hatterer has waived her attack on her conviction and sentence on Count Thirteen, because she did not challenge her conviction or sentence on appeal. Indeed, she did not file any appeal in this case. In the Eleventh Circuit, under the procedural default rule, "a defendant generally must advance an available challenge to a criminal conviction or sentence on direct appeal or else the defendant is barred from presenting that claim in a § 2255 proceeding." McKay v. United States, 657 F.3d 1190, 1196 (11th Cir. 2011) (internal citation and punctuation omitted). The procedural default rule "'is neither a statutory nor a constitutional requirement, but it is a doctrine adhered to by the courts to conserve judicial resources and to respect the law's important interest in the finality of judgments.'" Id. (quoting Massaro v. United States, 538 U.S. 500, 504 (2003)).

A showing of "cause and prejudice" can overcome a defendant's default. Id.[6] More specifically, a defendant can overcome "application of the procedural default bar by show[ing]

---

[6] "Under the actual innocence exception—as interpreted by current Supreme Court doctrine—a movant's procedural default is excused if she can show that he is actually innocent either of the crime of conviction or, in the capital sentencing context, of the sentence itself." McKay, 657 F.3d at 1196 (citing Dretke v. Haley, 541 U.S. 386, 388 (2004)). However, even if the actual innocence exception could apply to Hatterer's claims, as explained below, she has failed to plausibly allege that she was actually innocent of Count Thirteen under any standard. The record, including her own admissions, indisputably establishes her guilt.

cause for not raising the claim of error on direct appeal and actual prejudice from the alleged error." Id. (citing Lynn v. United States, 365 F.3d 1225, 1234 (11th Cir.2004) (alteration in original)).  To show cause for procedural default, a defendant must show that "some objective factor external to the defense prevented [her] or [her] counsel from raising [her] claims on direct appeal and that this factor cannot be fairly attributable to [defendant's] own conduct." Lynn, 365 F.3d at 1235.

To be certain, a meritorious claim of ineffective assistance of counsel can constitute cause to excuse a procedural default.  United States v. Nyhuis, 211 F.3d 1340, 1344 (11th Cir. 2000).  However, a defendant does not clear the procedural default hurdle merely by invoking the phrase "ineffective assistance" or making conclusory allegations about counsel's performance.  As the Eleventh Circuit has explained:

> In order to [excuse procedural default], however, the claim of ineffective assistance must have merit.  [Greene v. United States, 880 F.2d 1299, 1305(11th Cir. 1989).]  To determine whether it does, we must decide whether the arguments the defendant alleges his counsel failed to raise were significant enough to have affected the outcome of his appeal.  Miller v. Dugger, 858 F.2d 1536, 1538 (11th Cir. 1988).  Appellate counsel is not ineffective for failing to raise claims "reasonably considered to be without merit."  Alvord v. Wainwright, 725 F.2d 1282, 1291 (11th Cir. 1984).

Id.

As discussed below at length, Hatterer does not raise a meritorious claim of ineffective assistance of counsel.  At the very least, it was reasonable for Mr. Johnson to consider that challenging Hatterer's conviction on Count Thirteen would be without merit.  Further, Hatterer has failed to show that any arguments Mr. Johnson supposedly should have made that would have affected the outcome of this case.  Additionally, while Hatterer makes conclusory allegations regarding her mental capacity, she fails to establish any link between Mr. Johnson's alleged failure to investigate her mental state and Johnson's decision to not appeal her

conviction.  Moreover, though the Court discussed Hatterer's appeal rights at the conclusion of her sentencing hearing, Hatterer directed Mr. Johnson not to file an appeal in this case as evidence by her post-conviction certification.  (Doc. 441.)

In short, Hatterer has failed to demonstrate the "cause and prejudice" necessary to excuse her procedural default.  Because she failed to directly appeal her conviction or sentence on Count Thirteen, she cannot now collaterally attack that conviction and sentence through a Section 2255 Motion.

### C.    Hatterer's Knowing, Voluntary, and Intelligent Guilty Plea Bars her Attack on her Section 924(c) Conviction.

After pleading guilty, a defendant can only attack her resulting conviction in "strictly limited" circumstances.  Bousley v. United States, 523 U.S. 614, 621 (1998).  A Section 2255 challenge to a conviction by guilty plea is "ordinarily confined to whether the underlying plea was both counseled and voluntary.  If the answer is in the affirmative, then the conviction and the plea, as a general rule, foreclose the collateral attack."  United States v. Broce, 488 U.S. 563, 569 (1989) (finding constitutional that defendant could not raise double jeopardy claim on collateral attack following guilty plea).  Pertinently, a "knowing and voluntary guilty plea waives all non–jurisdictional, pre–plea defects, including ineffective assistance of counsel with respect to issues not implicating the voluntariness of the plea."  Wilson v. United States, 962 F.2d 996, 997 (11th Cir. 1992) (per curiam).  Throughout her pleadings, Hatterer implies that her guilty plea was involuntary, because Mr. Johnson did not allow her to review the evidence against her and pushed her into pleading guilty.

As set forth in Background Section II above, the "careful and detailed" procedure the Court employed at the Rule 11 hearing entirely refutes these arguments.  Particularly given Hatterer's sworn statements during that hearing, Hatterer cannot credibly argue that her guilty

plea was involuntary, unknowing, or unintelligent.  <u>Stitzer</u>, 785 F.2d at 1514 n.4.  As laid out above, during the plea hearing, the Court went to great lengths to make certain that Hatterer's guilty plea was a product of her own free choice and made with full knowledge of the consequences of that plea.  (Doc. 771.)  Hatterer stated that no one had made or forced her to plead guilty or threatened, pressured, forced, or intimidated, her or someone close to her to get her to plead guilty, and no one had leaned on her, bribed her, or promised her anything to induce her guilty plea.  (<u>Id.</u>at pp. 4, 36—37, 38.)  Hatterer testified that her decision to plead guilty was voluntary, of her own free will, and knowing and that she was pleading guilty because she was in fact guilty of the charges in Counts One and Thirteen.  (<u>Id.</u> at pp. 37, 38.)  Having carefully observed and questioned Hatterer at length, including a discussion regarding her mental illnesses and her treatment for the same, the Court found that Hatterer was competent and able to make important decisions, and Hatterer agreed with that assessment.  (<u>Id.</u> at pp. 7—11.)  Throughout the plea hearing, Hatterer was able to converse with the Court, recount personal information, and respond to all the Court's questions, and she repeatedly stated that she understood everything that the Court had said and done during the hearing and that she had no questions of the Court or her counsel.  (<u>Id.</u> at pp. 24, 30, 47.)  Among other things, the Court apprised Hatterer of the rights she would waive if she pleaded guilty, (<u>id.</u> at pp. 13—14); the elements of the crimes with which she was charged, (<u>id.</u> at pp. 17—18); the minimum and maximum potential penalties and other consequences she faced if she pleaded guilty, (<u>id</u> at pp. 18—24).  She testified throughout the hearing that she understood the Court's explanations.  Based on her sworn statements, the Court concluded that Hatterer knowingly and intelligently participated in the hearing and that her offer to plead guilty was voluntary and that her decision to plead guilty was "not the result of any force, pressure, threats or promises, other than the promises made by the government in the plea

agreement." (<u>Id.</u> at p. 38.)  Hatterer testified under oath that she agreed with that assessment. (<u>Id.</u>)

At no point during her plea hearing did Hatterer indicate in any way that she did not understand the proceedings or the decision she was making.  At no point did Hatterer indicate that she did not understand the wrongfulness of her actions or that her attorney had failed to fully investigate any issue.  She testified that she wanted to plead guilty to Counts One and Thirteen because she was in fact, guilty of those two Counts.  Importantly, despite being given every opportunity to do so, Hatterer never expressed any confusion whatsoever about the elements of the charges against her or the penalties that she faced.  Indeed, as detailed above, when Hatterer asked a question about Count Thirteen, the Court apprised Hatterer of what it meant to possess a firearm in furtherance of a drug trafficking crime and Hatterer stated that she understood the elements of the charge, that she had no further questions about the charge for the Court or her attorney, and that she was guilty of the elements of the charge.  (<u>Id.</u>at p. 35—36.)  Given this extensive colloquy and Hatterer's sworn declarations, Hatterer cannot now be heard to argue that her plea was unknowing or involuntary.  <u>Blackledge</u>, 431 U.S. at 73–74.

Hatterer's sworn statements at her Rule 11 hearing also thwart her claim that Mr. Johnson was forcing her to plead guilty and that he did not review the discovery with her.  Again, Hatterer repeatedly testified that no one was forcing her or making her plead guilty.  Further, Hatterer stated that she had authorized Mr. Johnson to negotiate a plea agreement for her. (Doc. 771, p 25.)  Hatterer told the Court under oath that she understood her right to counsel, that nothing about her relationship with Mr. Johnson was influencing her decision to plead guilty, that she had a sufficient opportunity to meet with Mr. Johnson, that they had met five or six times, and that she was satisfied with his representation and advice, that they had fully discussed

her case, that she and Mr. Johnson had reviewed and discussed the charges against her that they had reviewed the discovery that the Government had provided regarding those charges, that they had discussed her rights to trial and any defenses that they could present if the case went to trial, that Mr. Johnson had gone over the case with her and allowed her to go over her case with him, that they had reviewed the plea agreement together and the federal sentencing scheme including the Sentencing Guidelines, and that she had no "complaints about him whatsoever,". (Id. at pp. 15—16, 25, 37—38.)

Further, In the plea agreement itself, Hatterer agreed, among other things, to the factual basis of the charges against her and to her guilt of Counts One and Thirteen. She agreed that she would not be able to back out of his guilty plea if she received a sentence more severe than she expected. Pertinently, through the Agreement, Hatterer relayed to the Court her complete satisfaction with her attorney's representation and confirmed that he had rendered faithful, skillful, and diligent assistance. Hatterer testified at the Rule 11 hearing that she had read every word of the plea agreement, that she discussed it with Mr. Johnson before signing it, that she understood what the plea agreement said and what it meant, and that she understood she was agreeing to be bound by all the facts and terms of the plea agreement, and that she was not relying upon any promises outside of the plea agreement.

The Court must rely upon the truthfulness of Hatterer's prior sworn statements when ruling on her Section 2255 Motion. She cannot now come to this Court and argue in direct contradiction to this testimony. Thus, the Court finds that Hatterer's guilty plea was knowing, intelligent, and counseled and that it forecloses her attack on her Section 924(c) conviction.

    **D.**    **Hatterer's Attack on her Section 924(c) Conviction and Sentence Fails on the Merits.**

Even if Hatterer's collateral attack waiver, lack of direct appeal, and knowing and intelligent guilty plea did not each thwart her attack on her Section 924(c) conviction and sentence, her claims would still fail on the merits.

As an initial matter, the Court rejects Hatterer's claims that the prohibition against possessing a firearm in furtherance of a drug trafficking crime violates the Second Amendment. The United States Court of Appeal for the Eleventh Circuit Court has denied similar constitutional challenges to Section 924(c). See, e.g., United States v. Thorton, 395 F. App'x 574, 577 (11th Cir. 2010) ("As the Supreme Court observed in [District of Columbia v. Heller, 554 U.S. 570, 595 (2008)], 'the right secured by the Second Amendment is not unlimited.'").

Also, Hatterer's repeated request that her sentence on Count Thirteen run concurrent to her sentence on Count One is contradicted by Section 924(c) itself which the Supreme Court has interpreted as explicitly requiring the sentence to run consecutively. See Abbott v. United States, 562 U.S. 8, 13 (2010) ("a defendant is subject to a mandatory, consecutive sentence for a § 924(c) conviction").

Additionally, Hatter's invocation of Johnson v. United States, 576 U.S. 591 (2015), and Sessions v. Dimaya, ___ U.S. ___, 138 S. Ct. 1204 (2018) is nonsensical. Johnson only invalidated the Armed Career Criminal Act's ("ACCA") residual clause and its definition of "crime of violence" found within 18 U.S.C. § 924(e)(2)(B)(ii). 576 U.S. at 606. Dimaya applied Johnson's holding to the definition of crime of violence found within the Immigration and Nationality Act ("INA"). ___ U.S. ___, 138 S. Ct. at 1223. Hatterer was not convicted under the ACCA or INA, and neither the residual clause nor any similar statutory provision played any part in her sentencing whatsoever. Moreover, she was convicted of possessing a firearm in

furtherance of a drug trafficking crime, not a crime of violence.  See McKay v. United States, No. 16–15377-D, 2017 WL 3597200, at *2 (11th Cir. Apr. 17, 2017) ("Here, McKay was convicted of using or carrying a firearm during or in relation to a drug–trafficking crime. Thus, even assuming arguendo that Johnson is somehow applicable to § 924(c), his conviction on this count does not raise any residual clause issues regarding § 924(c)'s crime–of–violence definition."); see also Navarro v. United States, 679 Fed. Appx. 973, 974 (11th Cir. 2017); United States v. Parnell, 652 Fed. Appx. 117, 122 (3d Cir. 2016) ("Johnson does not call into question the statute's unambiguous definition of 'drug trafficking crime.'").  Further, Hatterer's possession of methamphetamine with intent to distribute unquestionably fits the definition of a drug trafficking crime.  As such, she has failed to explain how Johnson, Dimaya, or any related authority would call her Section 924(c) conviction into question.

Hatterer also attacks the sufficiency of the evidence underlying her Section 924(c) conviction.  Again, Hatterer's collateral attack waiver, her knowing and intelligent guilty plea, and her failure to raise this issue on appeal each independently bar this claim.  Even putting those issues aside, the facts that Hatterer now contends warrant overturing her Section 924(c) conviction actually support that conviction.  Throughout her Section 225 pleadings, Hatterer concedes that she dealt drugs and that she possessed the firearm.  However, she contends that she did not possess the firearm in furtherance of a drug trafficking crime.  For instance, Hatterer states,

> I never said I bought the gun for protection, instead someone brought it to me to trade for meth.  The agent kept asking in different ways if I would use the gun to which I replied that I just had bought it and had never even shot it.  I was then asked if someone tried to rob me and I had the gun on me would I use it; I stated that I guess I may but that I wasn't too sure if I would actually be able to do it even in midst of that situation. Mr. Johnson, despite my numerous requests, never tried to fight the 924C charge.  When all I believe it should have been, by definition, only a possession of a firearm charge.

(Doc. 693–1, p. 15.)  She also argues, "[t]he firearm was not near me or the drugs, nor was it ever used, or produced to threaten in any way to anyone."  (Id. at p. 28.)  She further contends, "the guns [sic] were found under the passenger seat, while Hatterer was in the driver seat.  The drugs were nowhere near the gun.  And the car was not in [Hatterer's] name."  (Doc. 694, p. 4.)

To the extent that Hatterer argues that she did not violate Section 924(c) because she did not shoot or brandish the firearm, the Court easily rejects that argument.  Hatterer was convicted of possessing the firearm in furtherance of her drug trafficking activity under 18 U.S.C. § 924(c)(1)(A)(i) and not brandishing or discharging the firearm under Subsections 924 (c)(1)(A)(ii) or (iii).  As for the charge Hatterer pleaded guilty to, the Eleventh Circuit and other courts recognize the inherent utility of firearms to protect drug dealing activity.  United States v. Gray, 544 Fed. Appx. 870, 889 (11th Cir. 2013) ("We have recognized guns and drugs go together.").  To prove that Hatterer possessed a firearm "in furtherance of" a drug trafficking crime, the Government would have had to establish that the firearm "helped, furthered, promoted, or advanced the drug trafficking."  United States v. Timmons, 283 F.3d 1246, 1252 (11th Cir. 2002).  This requires "a showing of some nexus between the firearm and the drug selling operation."  Id. at 1253 (quotation marks omitted).  To determine whether such a "nexus" exists, the Eleventh Circuit considers a non–exclusive list of factors, including:

> the type of drug activity that is being conducted, accessibility of the firearm, the type of the weapon, whether the weapon is stolen, the status of the possession (legitimate or illegal), whether the gun is loaded, proximity to the drugs or drug profits, and the time and circumstances under which the gun is found.

Id. (quotation marks omitted).

Here, even accepting Hatterer's statements in her Section 2255 pleadings as true, these factors overwhelmingly support her Section 924(c) conviction.  At the time of the traffic stop on

November 20, 2018, Hatterer was conducting substantial purchases of methamphetamine including from a member of a notorious street gang. (Doc. 411 at ¶¶ 11, 12.) She was engaging in frequent hand to hand sales of methamphetamine which are fraught with danger. (Id. at ¶¶ 5—17.) On the date of her arrest, she and her codefendant had easy access to the firearm while traveling to and from a gas station and while at the gas station while she sold over six grams of methamphetamine to a confidential informant in close proximity to the car. (Id. at ¶¶ 9, 10.) According to Hatterer, the firearm was located under the vehicle's front passenger seat which was directly adjacent to the center console in which Hatterer had stored a substantial amount of methamphetamine (52.27 grams). (Id.; Doc. 694, p. 4.) The firearm was a handgun and a type often used in the drug trade. Hatterer admits that she possessed the firearm illegally (as she must as she was unquestionably a convicted felon), and the firearm was loaded with 14 rounds of ammunition. (Doc. 411 at ¶ 10.) On similar facts, the Eleventh Circuit has repeatedly found that the Government met its burden of proving a defendant possessed a firearm in furtherance of a drug trafficking crime. See, e.g., United States v. Wilson, No. 20–14576, 2021 WL 4470237, at *7 (11th Cir. Sept. 30, 2021) (upholding conviction for possession of firearm in furtherance of drug trafficking where firearm was found in vehicle that was not owned by or registered to defendant but defendant used vehicle to conduct controlled purchases of methamphetamine and defendant admitted ownership of drugs found in vehicle); United States v. Dixon, 901 F.3d 1322, 1341 (11th Cir. 2018) (upholding conviction where loaded firearm found under passenger seat, drugs found in car, and defendant utilized car to conduct drug transaction); United States v. Savage, 653 F. App'x 754, 756 (11th Cir. 2016) (upholding conviction where pistol found under passenger seat and drugs found in vehicle); United States v. Cunningham, 633 Fed. Appx. 920, 923 (11th Cir. 2015) ("Given the proximity of these drug–related pieces of

evidence to the handgun, a reasonable trier of fact could find that the Government established the nexus required for the 'furtherance' element."); United States v. Verdieu, 520 F. App'x 865, 866 (11th Cir. 2013) (evidence supported conviction where agents found fully loaded .38 caliber pistol in vehicle's center console between the driver's seat and the front passenger seat when arresting defendants for attempting to purchase oxycodone from confidential informant); United States v. Garcia, 489 F. App'x 334, 335 (11th Cir. 2012) ("[w]e have not required that the drugs and firearm be located in the same compartment" and conviction upheld where defendant drove to Florida with a fully loaded, semi–automatic firearm in the front console of the truck, knowing that he would negotiate a cocaine deal and defendant agreed to drive vehicle containing the cocaine to a storage location, and intended for his codefendant to follow him in the truck with the firearm); United States v. Haile, 685 F.3d 1211, 1219–20 (11th Cir. 2012) (conviction upheld where licensed gun in center console of vehicle found in close proximity to money defendant intended to use to purchase drugs); United States v. Lopez–Garcia, 565 F.3d 1306, 1322 (11th Cir. 2009) ("The nexus between the gun and the drug trafficking here is plainly established by, for example, the accessibility of the firearm to [defendant], and the proximity of the gun to the drugs and the drug profits."); United States v. Smith, 173 Fed. Appx. 742, 747–48 (11th Cir. 2006) (conviction affirmed where defendant was a convicted felon that obtained revolvers in exchange for drugs, defendant stated he used the firearms for protection, guns were not "a type typically used for a legal purpose, such as hunting," and bullets were recovered in close proximity to evidence indicating drug distribution).[7]

---

[7] Given this precedent, the Court rejects any claim that Mr. Johnson was ineffective for not challenging Hatterer's Section 924(c) charge. Dias v. United States, No. 17–60106–CR, 2020 WL 5868176, at *5 (S.D. Fla. Aug. 5, 2020), report and recommendation adopted sub nom., No. 17–60106–CR, 2020 WL 5848614 (S.D. Fla. Oct. 1, 2020) ("counsel had no basis to contest that the Government could establish a nexus between firearm and drug trafficking offense where firearm was found in the driver's side door pocket and drugs were found under passenger seat").

Hatterer's attack on the sufficiency of the evidence underlying her Section 924(c) conviction withers even more easily when considered against the undisputed evidence of record including her own statements at her Rule 11 hearing and during sentencing.

As laid out in Background Section II above, during the change of plea hearing, the Court specifically advised Hatterer of the elements of the charges to which she was pleading guilty. She stated that she had no questions about those elements and that she was guilty of those elements.  The Court explained to her that "possessing a firearm in furtherance of a drug crime means that the firearm, helped, promoted, or advanced the crime in some way."  (Doc. 771, p. 35.)  This was a correct statement of the law.  Timmons, 283 F.3d at 1252.  Hatterer stated that she understood the Court's explanation and that she had no further questions regarding what it means to possess a firearm in furtherance of a drug trafficking crime.  (Doc. 771, p. 35—36.) She then admitted that she possessed the firearm charged in Count Thirteen of the Indictment in furtherance of the drug trafficking crime charged in Count Twelve of the Indictment.  (Id.) Moreover, Hatterer agreed with the AUSA's factual proffer, and she specifically agreed with the statement that Hatterer had admitted to agents that she possessed the firearm for protection "which would go into the drug trafficking."  (Id. at pp. 34, 36.)

Additionally, at the end of the Rule 11 hearing, the Court previewed the presentence investigation process with Hatterer and advised her to read the PSI carefully and to notify Mr. Johnson if she had any disagreement with the PSI.  The PSI recounted Hatterer's statements to agents that her occupation was selling drugs and that she obtained the firearm from a codefendant in November 2018.  (Doc. 411 at ¶¶ 11, 12.)  The PSI also detailed Hatterer's sale of methamphetamine on November 20, 2018 (the sale alleged in Count Twelve of the Indictment) and the agents' discovery of the firearm "under the driver's seat in which Hatterer

was seated" during a traffic stop directly after that sale.  (Id. at ¶ 10.)  Additionally, during the presentence investigation, Hatterer told the Probation Officer that she possessed a firearm for protection even though she knew she was not supposed to possess it.  (Id. at ¶ 20.)  Upon the Court's questioning at sentencing, Hatterer stated that she had read "every word" of the PSI that she did not "disagree with anything in there."  (Doc. 772, p. 4.)

Despite her admissions, Hatterer now claims that agents tricked her into admitting that she possessed the firearm for protection by asking her if she would have used the firearm to defend herself if she was robbed.  (Doc. 693–1, p. 15.)  Once again, Hatterer's own statements support her conviction.  A drug dealer's possession of a firearm to protect herself, her drugs, and the proceeds of her drug sales in the event of a robbery is the precise type of furtherance of drug trafficking that Section 924(c) contemplates.  United States v. Blough, 832 F. App'x 961, 965 (6th Cir. 2020) ("Put differently, the protection from robbery the firearms provided may also have facilitated [defendant's] drug trafficking, or his engaging in it to a greater extent than he otherwise would have."); United States v. Maya, 966 F.3d 493, 500 (6th Cir. 2020) ("If, for example, a drug dealer owns a gun 'to protect the drugs, the proceeds of drug sales, or the dealer himself,' that possession–for–protection purpose will facilitate the crime."  (quoting United States v. Bailey, 882 F.3d 716, 721 (7th Cir. 2018)); United States v. Dixon, 317 F. App'x 889 (11th Cir. 2008) (affirming conviction because evidence was sufficient to conclude that defendant possessed handgun to protect drugs and drug profits, as required to convict defendant of knowingly possessing firearm in furtherance of drug trafficking crime); United States v. Miranda, 425 F.3d 953, 962 (11th Cir. 2005) (firearm was possessed in furtherance of drug trafficking because it served as a "defense or deterrence" in furtherance of the drug operation); United States v. Suarez, 313 F.3d 1287, 1293 (11th Cir. 2002) (quantity of drugs could be factor

from which jury could reasonably infer that guns served as protection of defendants' investment in their drug shipment).

Moreover, Hatterer's statement in support of her Section 2255 Motion that someone "brought [the gun to her] to trade for meth," (doc. 693–1, p. 15),  is yet another basis to find that she possessed the firearm in furtherance of a drug trafficking activity.  Courts have repeatedly held that when a defendant accepts a gun in exchange for drugs, the defendant possesses the gun in furtherance of that drug trafficking activity.  See United States v. Miranda, 666 F.3d 1280, 1281 (11th Cir. 2012) ("Along with every other circuit court that has decided this issue, we conclude that bartering drugs for firearms furthers trafficking in drugs."); United States v. Mahan, 586 F.3d 1185, 1188 (9th Cir. 2009) (collecting cases).

Given the entirety of the record, particularly Hatterer's own admissions during her Rule 11 and sentencing proceedings and even her statements in her Section 2255 pleadings, Hatterer cannot plausibly argue that she did not know what it meant to possess a firearm in furtherance of a drug trafficking crime, that the gun was not located near her or the drugs, or that she did not possess the firearm in furtherance of her drug trafficking activities.  The record contains more than ample evidence that she possessed the firearm charged in Count Thirteen of the Indictment in furtherance of her drug trafficking crime charged in Count Twelve of the Indictment.  This provides yet another reason for the Court to **DENY** Hatterer's attempt to set aside her Section 924(c) conviction and sentence.

## II.   Hatterer's Claims of Ineffective Assistance of Counsel

Criminal defendants have a right to effective assistance of counsel at all critical stages of the proceedings.  Strickland v. Washington, 466 U.S. 668 (1984).  This right extends to the entry of a guilty plea, Hill v. Lockhart, 474 U.S. 52, 58 (1985), and during sentencing proceedings,

Glover v. United States, 531 U.S. 198, 202 (2001).  A defendant's guilty plea, appeal waiver, or collateral attack waiver does not preclude an ineffective assistance of counsel claim premised on an involuntary and unintelligent plea.  United States v. Puentes–Hurtado, 794 F.3d 1278, 1281, 1285 (11th Cir. 2005).

"The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied upon as having produced a just result."  Strickland, 466 U.S. at 686.  A convicted defendant must meet two components to establish that counsel's assistance was so defective as to require reversal of a conviction or sentence: (1) his counsel's performance was deficient, i.e., the performance fell below an objective standard of reasonableness, and (2) he suffered prejudice as a result of that deficient performance.  Id. at 685–86.  "If a petitioner cannot satisfy one prong, we need not review the other prong."  Duhart v. United States, 556 F. App'x 897, 898 (11th Cir. 2014).  Thus, if a defendant cannot show prejudice, the Court need not determine whether defendant's allegations show his counsel's performance fell below an objective standard of reasonableness.

The deficient performance requirement concerns "whether counsel's advice was within the range of competence demanded of attorneys in criminal cases."  Hill, 474 U.S. at 56.  There is a strong presumption that counsel's conduct fell within the range of reasonable professional assistance.  Davis v. United States, 404 F. App'x 336, 337 (11th Cir. 2010) (citing Strickland, 466 U.S. at 686).  "It is petitioner's burden to 'establish that counsel preformed outside the wide range of reasonable professional assistance' by making 'errors so serious that [counsel] failed to function as the kind of counsel guaranteed by the Sixth Amendment.'"  LeCroy v. United States, 739 F.3d 1297, 1312 (11th Cir. 2014) (quoting Butcher v. United States, 368 F.3d 1290, 1293

(11th Cir. 2004) (second alteration in original)).  "[A] court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct."  Strickland, 466 U.S. at 690. Further, retrospective judicial scrutiny of counsel's performance "must be highly deferential" and must "eliminate the distorting effects of hindsight."  Id. at 689.  "In evaluating performance, 'counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.'"  LeCroy, 739 F.3d at 1312 (quoting Strickland, 466 U.S. at 690).  "[B]ecause counsel's conduct is presumed reasonable, for a petitioner to show that the conduct was unreasonable, a petitioner must establish that no competent counsel would have taken the action that his counsel did take."  Chandler v. United States, 218 F.3d 1305, 1315 (11th Cir. 2000).

Even if counsel made an error so egregious as to be outside the broad scope of competence expected of attorneys, a movant could obtain relief only if the error caused actual prejudice.  Strickland, 466 U.S. at 691–92.  "Showing prejudice requires petitioner to establish a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  LeCroy, 739 F.3d at 1312 (internal citation omitted).  "The prejudice prong requires a petitioner to demonstrate that seriously deficient performance of his attorney prejudiced the defense."  Id. at 1312–13.  "The likelihood of a different result must be substantial, not just conceivable."  Harrington v. Richter, 562 U.S. 86, 112 (2011).  A reasonable probability of a different result "is a probability sufficient to undermine confidence in the outcome."  Strickland, 466 U.S. at 694.

Hatterer contends that Mr. Johnson rendered ineffective assistance of counsel in the following areas prior to her guilty plea: (1) Mr. Johnson failed to review all of the discovery with

Hatterer and rushed her into pleading guilty (doc. 647 p. 1; doc. 693, p. 6; doc. 693–1, pp. 14—15); (2) Mr. Johnson told her that she would be subject to a sentence of fifteen years, (doc. 647–1, pp. 1—2; doc. 693, p. 4; doc. 693–1, pp. 14—15); and (3) Mr. Johnson failed to adequately investigate and address her history of mental illness, (doc. 647–1, p. 2; doc. 693, p. 5, doc. 693–1, p. 15).  Construing her claims liberally, she also claims that Mr. Johnson rendered ineffective assistance at sentencing by failing to raise her history of mental illness, and by telling her that she could not appeal certain issues, (doc. 647–1, p. 2; doc. 693–1, p. 14).

**A. Hatter has Failed to Demonstrate that Mr. Johnson Rendered Deficient Assistance Prior to her Guilty Plea or that She Suffered any Prejudice From any Alleged Deficiencies.**

**1. Mr. Johnson's Advice and Discovery Review Prior to Plea**

Hatterer contends that Mr. Johnson rendered ineffective assistance in the following areas prior to her guilty plea: (1) Mr. Johnson failed to review all of the discovery with Hatterer and rushed her into pleading guilty (doc. 647 p. 1; doc. 693, p. 6; doc. 693–1, pp. 14—15); (2) Mr. Johnson told her that she would be subject to a sentence of fifteen years, (doc. 647–1, pp. 1—2; doc. 693, p. 4; doc. 693–1, pp. 14—15); and (3) Mr. Johnson failed to adequately address her history of mental health.

As explained in Discussion Section I.C. above, Hatterer's "knowing and voluntary guilty plea waive[d] all non–jurisdictional, pre–plea defects, including ineffective assistance of counsel with respect to issues not implicating the voluntariness of the plea."  Wilson, 962 F.2d at 997. The Court has already explained the careful and detailed procedure it employed at the Rule 11 hearing to be certain that Hatterer was pleading guilty knowingly and intelligently.  Hatterer testified, among other things, that she was pleading guilty knowingly and voluntarily, that she had adequate time to meet with Mr. Johnson, that he had reviewed discovery with her, that

47

nothing about her relationship with him was influencing her decision to plead guilty, that she was entirely satisfied with his representation, and that no one was forcing her or pushing her to plead guilty. The Court rejects her attempts to directly contradict her own sworn statements at her Rule 11 hearing. See Stitzer, 785 F.2d at 1514 n.4. It is patently absurd for Hatterer to now seek to shirk her solemn declarations in her Rule 11 hearing and her plea agreement. Given the careful and detailed procedure employed by the Court, Hatterer's knowing, voluntary, and intelligent plea bars her claims that Mr. Johnson rendered ineffective assistance prior to the entry of her guilty plea. See Cruz v. United States, 188 F. App'x 908, 914 (11th Cir. 2006) (affirming dismissal of ineffective assistance claim where movant claimed counsel coerced her into pleading guilty based on misrepresented facts about the case and sentencing given the court's thorough explanation at plea hearing); United States v. Miley, 119 F. App'x 330, 332 (2d Cir. 2005) (holding that any prejudice from defense counsel's alleged misrepresentations was dispelled by the time movant pleaded guilty and acknowledged that no promises had, in fact, been made to him outside of the plea agreement).

Even if Hatterer's guilty plea did not waive these claims, she has failed to demonstrate: (1) that Mr. Johnson's performance was deficient, i.e., the performance fell below an objective standard of reasonableness; or (2) that Hatterer suffered prejudice because of that deficient performance. Strickland, 466 U.S. at 685–86. A Section 2255 movant asserting an ineffective assistance of counsel claim in the guilty plea process must establish that counsel's performance was deficient (i.e., professionally unreasonable) and that the deficient performance "affected the outcome of the plea process." Hill, 474 U.S. at 59. In other words, to establish prejudice, the movant "must show that there is a reasonable probability that, but for counsel's errors, he would . . . have pleaded [not] guilty and would . . . have insisted on going to trial." Id.; see also Slicker

v. Wainwright, 809 F.2d 768 (11th Cir. 1987) (to be entitled to an evidentiary hearing on whether petitioner's lawyer incorrectly advised petitioner that the negotiated plea agreement provided that he would serve less time than the maximum penalty, petitioner was required to establish that he would not have pleaded nolo contendere and would have insisted on going to trial had his lawyer not misled him with faulty information).

Further, a mere allegation by a defendant that he would have insisted on going to trial but for counsel's errors, although required, is insufficient to establish prejudice. Rather, "the court must look to the totality of the objective factual circumstances surrounding the plea in order to determine whether there is a reasonable probability that the [movant] would in fact have insisted on trial." Suarez v. United States, No. 15–CR–20144, 2017 WL 3208725, at *5 (S.D. Fla. June 19, 2017), report and recommendation adopted, No. 16–24003–CIV, 2017 WL 3206328 (S.D. Fla. July 27, 2017) (citing Hill, 474 U.S. at 59; Hutchings v. United States, 618 F.3d 693, 697 (7th Cir. 2010)). This inquiry will often include an assessment of the strength of the prosecution's case, any available defenses the movant could have asserted at trial, the plea colloquy, and the movant's potential sentencing exposure. Id.

Other than conclusory allegations that contradict her own sworn statements, Hatterer has failed to allege that Mr. Johnson rendered defective assistance prior to the plea hearing. Hatterer contends that Mr. Johnson failed to review all the discovery with her and rushed her into pleading guilty. However, Hatterer testified to just the opposite during the change of plea hearing. (Id. at pp. 15—15.)

Hatterer also takes issue with Mr. Johnson's advice that the best plea agreement he could get for her would subject her to fifteen years in prison. Hatterer contends that during sentencing, Mr. Johnson stated "'Your Honor, I was going to say what the District Attorney said in slightly

different wording; when I first met Ms. Hatterer I truly felt that 15 years was the best I was going to be able to get for her.  However, after reading her PSI I feel as though I have made a mistake and should have been asking or 5 years.'"  (Doc. 693-1, p. 15.)  This is not what Mr. Johnson stated.  Rather, he stated, "Your Honor, counsel from the government stated a lot of the same things that I was going to say.  He may have put a different spin on them, obviously.  But my client started off life below the bottom rung of the ladder, and she's never really gotten back up." (Doc. 772, p. 9.)  The Court has reviewed the entire sentencing transcript and has not found any area where Mr. Johnson said he made a mistake in telling Ms. Hatterer how much prison time she likely faced or otherwise.  Moreover, Hatterer testified during her Rule 11 hearing that no one had made any promises or guarantees to her about what sentence she would receive, that she realized that all anyone could provide her was an estimate or best guess of her sentence and that estimate would not be binding on the Court, and that it was solely up to the Court to decide her sentence.  (Doc. 771, p. 22.)  As set forth in Background Section II above, at the Rule 11 hearing, the Court reviewed the sentencing process with Hatterer in detail and she repeatedly testified that she understood the mandatory minimum and maximum penalties associated with the charges to which she was pleading guilty.  (Id. at pp. 15—24.)  Once again, Hatterer's sworn statements patently contradict the claims she now makes.

In any event, Hatterer has failed to demonstrate that Mr. Johnson's assessment of her prospects was faulty advice.  As set forth in Background Sections II and III, according to the AUSA's proffer at the Rule 11 hearing, Hatterer's own testimony, and the evidence detailed in the PSI, the Government had a mountain of evidence against Hatterer that proved that she participated in a conspiracy to distribute more than fifty grams of methamphetamine and that she possessed a firearm in furtherance of a drug trafficking crime on at least one occasion.  The

evidence of Hatterer's crimes included controlled sales of methamphetamine that Hatterer made to confidential informants, statements of codefendants, seizures of firearms and well over fifty grams of methamphetamine, and Hatterer's own admissions to agents that she purchased and sold substantial amounts of methamphetamine and possessed firearms while doing so. Long before Mr. Johnson represented Hatterer, she had already provided two proffers to the Government and given them all the proof they needed to convict her of Counts One and Thirteen. Indeed, as set forth in Discussion Section I.D. above, Hatterer continues to make statements even in her Section 2255 pleadings that demonstrate that she is unquestionably guilty of Counts One and Thirteen. Fifteen years' imprisonment was simply the mandatory minimum sentence Hatterer could receive for those crimes that she has repeatedly stated that she was in fact guilty of committing.

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████ Thus, it would have been foolish for Mr. Johnson to tell Hatterer that she did not face at least fifteen years' imprisonment.[8] Indeed, not apprising her of the mandatory minimum sentences she faced would have been ineffective assistance.

---

[8] ████████████████████████████████████████████████

In sum, the Government would have presented the jury with significant evidence of Hatterer's guilt had she gone to trial, and Congress has established mandatory minimum sentences of fifteen years for crimes that Hatterer was indisputably guilty of committing. Thus, it was quite reasonable for Mr. Johnson to advise Hatterer of her dismal prospects. United States v. Hall, No. CIV.A. 09–00319, 2011 WL 4101504, at *3 (S.D. Ala. Sept. 13, 2011) (rejecting 2255 movant's conclusory claim that counsel rendered ineffective assistance by advising him that he had "no chance of winning" at trial because, among other reasons, movant failed to demonstrate that advice was erroneous); see also Doyle v. Jones, 452 Fed. App'x 836, 841–42 (10th Cir. 2011) (defendant failed to demonstrate counsel was ineffective for giving an unrealistic assessment of the case where defendant failed to demonstrate either that counsel misadvised him on the relative merits of his options, or that counsel's performance was professionally unreasonable); Dickison v. Jones, No. 3:13CV590/LC/CJK, 2016 WL 908864, at *6 (N.D. Fla. Feb. 8, 2016) (to state a legally sufficient claim on grounds for advice on chances of success at trial, movant must prove some specific deficiency such as counsel's assessment was unreasonable under the circumstances or that counsel had not investigated or otherwise was not familiar with the case), *report and recommendation adopted*, 2016 WL 901686 (N.D. Fla. Mar. 9, 2016).

Moreover, even if Mr. Johnson's pre–plea assistance and advice were somehow deficient, Hatterer does not even allege that she would have gone to trial but for Mr. Johnson's alleged



errors.  Moreover, the "totality of the objective factual circumstances" rebuts any claim that she would have gone to trial.  <u>Suarez</u>, 2017 WL 3208725, at *5.  As outlined above, the Government's case against Hatterer was strong and included the investigation described by the AUSA in the proffer at the Rule 11 hearing, the evidence recounted in the PSI, and Hatterer's own statements.  Even now in her Section 2255 pleadings, Hatterer continues to admit to the facts underlying Counts One and Thirteen, and she provides no credible defense to the Government's case. ███████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████ Indeed, it would have been entirely foolish for her to go to trial.

        Moreover, Hatterer significantly reduced her sentencing exposure by pleading guilty. She only pleaded guilty to Count One (the conspiracy count)) and to Count Thirteen (one of the two counts of possession of a firearm in furtherance of a drug trafficking crime pending against her).  In exchange, the Government agreed to dismiss all the remaining counts of the Indictment. If Hatterer had gone to trial she likely would have also been found guilty of Count Nine, the other charge of possession of a firearm in furtherance of a drug trafficking crime, as the evidence on that charge was substantial.  (<u>See</u> doc. 411, ¶ 7.)  By statute, a conviction on Count Nine would have subjected Hatterer to another five years' imprisonment served consecutively to her sentences on Counts One and Thirteen.  (<u>See</u> <u>id.</u> at ¶ 77.)  Thus, absent her guilty plea, she

_____

█ █████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████

would have faced a mandatory <u>minimum</u> of twenty years' imprisonment.  Moreover, even absent a conviction on Count Nine, without a guilty plea to Counts One and Thirteen, Hatterer would not have received a reduction in her offense level for acceptance of responsibility.  Thus, had she gone to trial and been found guilty of Counts One and Thirteen (counts to which she admitted her guilt and essentially continues to admit her guilt), her Guideline range would have been at least 195-228 months' imprisonment (135-168 months as to Count One plus sixty consecutive months as to Count Thirteen).  U.S.S.G. Sentencing Table.  Thus, through her plea negotiations and guilty plea, Hatterer reduced her sentencing exposure from a statutory minimum of twenty years to a statutory minimum of fifteen years, and from a Guideline range of twenty-one to twenty-four years to a Guidelines range of roughly fifteen years.

In light of these facts and the other circumstances surrounding Hatterer's plea, Hatterer has failed to show that but for Mr. Johnson's alleged errors she would have "rationally" insisted on going to trial.  <u>Padilla v. Kentucky</u>, 559 U.S. 356, 372 (2010) (citation omitted).  As such, she cannot meet the prejudice prong of her pre–plea ineffective assistance claims.

### 2. Investigation and Presentation of Defense Based on Mental Illnesses.

Hatterer also claims that Mr. Johnson failed to investigate and present evidence of her mental illnesses.  It is not clear if she is claiming that Mr. Johnson should have presented her mental illness as mitigation evidence at sentencing or if she is claiming that Mr. Johnson should have pursued an insanity defense or some other defense rather than advising her to plead guilty.[10]

---

[10] It does not appear that Hatterer contends that Mr. Johnson should have investigated whether she was competent to stand trial.  However, even if she had raised such a claim, the Court rejects that claim.

Regardless, Hatterer has failed to present a sufficient argument, much less evidence, to support either claim.

Throughout the Rule 11 proceeding, Hatterer agreed to her competence and testified that she knowingly committed the crimes to which she pleaded guilty. As laid out above in Background Section II, the Court questioned Hatterer at length regarding her mental health and Hatterer disclosed her illnesses but stated that she was of clear mind and able to understand the Court's questions and make important decisions. The Court asked her questions about her personal history and other matters, and she was able to recall several specifics. At no point during her plea hearing did Hatterer indicate in any way that she did not understand the proceedings or the decision she was making. She repeatedly told the Court that she understood everything the Court was stating and that she had no questions of the Court or her attorney. Further, at no point did Hatterer indicate that she did not understand the wrongfulness of her actions. To the contrary, she stated that she wanted to plead guilty to Counts One and Thirteen because she was indeed guilty of those crimes. Even at the end of the Rule 11 hearing, the Court asked Hatterer whether she had any questions about anything that had been done during the proceeding, and she stated that she did not. Given the extensive colloquy and Hatterer's sworn

---

Hatterer waived such a claim through her knowing and voluntary guilty plea and sworn statements to the Court. Moreover, Hatterer has not presented any evidence that she was unable to understand the proceedings against her or that she was unable to assist in her defense. In fact, the record in this case, including Hatterer' sworn testimony at the Rule 11 hearing, indicates just the opposite. Pertinently, Hatterer testified that she was competent and able to understand, among other things, the charges against her, the Court's questions, and her attorney's advice. She also testified that despite her medical history that she could clearly understand the Court's questions and make important decisions. Thus, it cannot be said that Mr. Johnson's decision not to have Hatterer' competency evaluated was below the standard of reasonableness expected of an attorney. Moreover, "[i]n order to demonstrate prejudice from [her] lawyer's failure to have [her] evaluated, [Hatterer] has to show that there was at least a reasonable probability that a psychological evaluation would have revealed that he was incompetent to stand trial." Alexander v. Dugger, 841 F.2d 371, 375 (11th Cir. 1988) (citing Adams v. Wainwright, 764 F.2d 1356, 1367 (11th Cir. 1985)). Hatterer has not presented any evidence, much less a reasonable probability, that a psychological evaluation would have found her incompetent. Indeed, the record points to just the opposite. Thus, Hatterer has not demonstrated ineffectiveness or prejudice on a putative claim that Mr. Johnson should have had her competency evaluated.

declarations, she cannot know be heard to argue that her plea was not knowingly and voluntarily made.  Blackledge, 431 U.S. at 73–74.  Her plea therefore bars her putative claims that Mr. Johnson failed to investigate her mental illnesses or present a defense based on those illnesses prior to her guilty plea.

Even if Hatterer's knowing and voluntary plea did not waive this claim, she has failed to demonstrate: (1) that Mr. Johnson's performance was deficient, i.e., the performance fell below an objective standard of reasonableness; or (2) that she suffered prejudice because of that deficient performance.  Strickland, 466 U.S. at 685–86.

To the extent that Hatterer contends that Mr. Johnson should have pursued an insanity defense, that argument falls flat.[11]  To mount a successful insanity defense, Mr. Johnson would

_____

[11] Hatterer does not argue that Mr. Johnson should have investigated her diminished capacity as opposed to a defense of insanity.  Furthermore, even if Hatterer could show that an evaluation of her mental status would have revealed diminished capacity, that evidence would not have been admissible as to her general intent charges of possessing a firearm as a convicted felon and likely would have been excluded as to her specific intent crimes of conspiracy, possession of methamphetamine with intent to distribute, and possessing a firearm in furtherance of a drug trafficking crime.  The Eleventh Circuit has "interpreted the [Insanity Defense Reform Act] 'to prohibit the presentation of evidence of mental disease or defect, short of insanity, to excuse conduct.'"  United States v. Litzky, 18 F.4th 1296, 1303 (11th Cir. 2021) (quoting United States v. Westcott, 83 F.3d 1354, 1358 (11th Cir. 1996)).  Thus, Hatterer could not argue that her diminished capacity made her vulnerable or otherwise predisposed to committing the crimes she committed.  Id.  Rather, she would have to establish a link between her mental illnesses and the likelihood that at the time she committed her specific intent crimes she did not form the mens rea associated with those offenses.  Id.  see also, United States v. Bates, 960 F.3d 1278, 1288–89 (11th Cir. 2020) (affirming exclusion of non-insanity psychiatric evidence as "inadmissible to negate mens rea because it would excuse conduct based on a defendant's 'inability or failure to engage in normal reflection.'"); United States v. Cameron, 907 F.2d 1051, 1067–68 (11th Cir. 1990) (excluding evidence regarding defendant's schizophrenia offered to show diminished capacity in prosecution for possession with intent to distribute); United States v. Peralta, 930 F. Supp. 1523, 1530 (S.D. Fla. 1996) (excluding evidence of diminished capacity in prosecution for general intent crimes "the Eleventh Circuit follows the universal rule that diminished capacity evidence is relevant only in the context of a specific intent crime, where the Defendant's formulation of an unlawful or malevolent purpose must be established by the Government") (citing United States v. Westcott, 83 F.3d 1354, 1357 (11th Cir. 1996); Cameron, 907 F.2d at 1067–68).  Given the overwhelming evidence, including her own admissions, that Hatterer knowingly conspired with others to distribute methamphetamine and that she knowingly possessed a firearm with the intent to further her drug trafficking activities, it was entirely reasonable for Mr. Johnson to not pursue this line of defense.  Moreover, Hatterer cannot show prejudice from any such failure, as the record reveals that she had the capacity to form the mens rea necessary for these crimes.  Hatterer has failed to offer anything other than conclusory allegations to the contrary.

have had to show that, at the time of the offense, Hatterer was unable to appreciate the nature and quality or the wrongfulness of her acts as a result of a severe mental disease or defect.  18 U.S.C. § 17(a).  A mental disease or defect alone is not enough to establish an insanity defense.  Id. Moreover, Hatterer would have borne the burden of proving an insanity defense by clear and convincing evidence.  18 U.S.C. § 17(b).  As the Eleventh Circuit has explained, a Section 2255 movant's "bare and unsubstantiated assertions that a reasonable probability existed that a jury would have found him insane had trial counsel conducted an investigation [are] insufficient to support his motion to vacate."  Collins v. United States, 481 F. App'x 525, 529 (11th Cir. 2012). Further, an attorney's decision to not pursue an insanity defense cannot be said to be ineffective where the only evidence of a defendant's mental instability was "sufficiently equivocal that reasonable counsel would not have been under a duty to secure a psychiatric examination." Bertolotti v. Bugger, 883 F.2d 1503, 1514 (11th Cir. 1989).  Moreover, the mere existence of a mental disease or defect does not create a per se rule that counsel should have the defendant's sanity evaluated.  See Onate–Sosa v. United States, No. 08–20164–CR, 2011 WL 1878211, at *13 (S.D. Fla. Jan. 13, 2011), report and recommendation adopted, No. 09–21555–CIV, 2011 WL 1883167 (S.D. Fla. May 17, 2011) (rejecting claim of ineffective assistance of counsel claim based on failure to have mental health evaluation of competency both at the time of the offense and prior to the change of plea proceeding, where defendant had bipolar disorder and schizophrenia because mental disease alone is not enough to establish incompetence or insanity, and it appeared from record, including change of plea and sentencing proceedings, that defendant was sane and competent and nothing in the record establishes otherwise).

Hatterer has failed to establish that Mr. Johnson's decision to not investigate or pursue an insanity defense fell outside of the wide range of professionally competent assistance.  Other

than bare allegations, Hatterer has not pointed to any evidence from which Mr. Johnson should have reasonably questioned that Hatterer was unable to appreciate the nature and quality or the wrongfulness of her acts.   18 U.S.C. § 17(a).   While she states that she and Mr. Johnson discussed her mental condition, she offers no evidence that she ever relayed to Mr. Johnson that she did not appreciate the nature and quality or the wrongfulness of her acts.   She apparently never asked Mr. Johnson to investigate an insanity defense.   Moreover, the record of Hatterer's mental disease is sufficiently equivocal that Mr. Johnson was not under a duty to secure a psychiatric examination.

While Hatterer apparently suffers from a severe mental disease or defect, that alone is not sufficient to warrant an insanity defense.   Further, the facts surrounding Hatter's crimes further confirm that she was able to appreciate the nature, quality, and wrongfulness of her acts.   An investigation revealed that Hatterer was conducting significant drug transactions, specifically selling methamphetamine out of her home.   (Doc. 411, ¶¶ 5–7.)   The investigation revealed that Hatterer not only conducted purchases and sales of large quantities of methamphetamine but that she traveled large distances to obtain methamphetamine, that she arranged sales, and that she took efforts to avoid detection including fleeing from law enforcement on at least one occasion. (Id. at ¶¶ 5–17.)   Before this time, Hatterer had garnered a litany of prior criminal convictions, including drug–related crimes.   (Id. at ¶¶ 34–48.)   In Hatterer's interviews with officers following her arrest, she did not express any confusion about her crimes.   Rather, she detailed her drug distribution history including providing specifics of amounts of drugs that she purchased and sold as well as prices that she paid and charged.   (Id.)

If this overwhelming evidence were not enough to establish that Hatterer appreciated the wrongfulness of her acts, her testimony before this Court solidifies that appreciation.   At her

Rule 11 hearing, she repeatedly admitted under oath to the wrongfulness of her conduct.  At the conclusion of the AUSA's proffer, the Court asked Hatterer if she disputed any of the information given, and Hatterer stated that she did not.  Hatterer was able to understand her wrongdoing in her own words.  Hatterer's statements of intent, purpose, and remorse at her Rule 11 hearing and her sentencing hearing thwart any claims that she was not able to appreciate the wrongfulness of her conduct.  Even in her Section 225 pleadings, Hatterer states that she knew what she was doing was illegal.

"Establishing insanity is a high bar."  <u>Sullivan v. Jones</u>, No. 4:12CV250/RV/CAS, 2015 WL 4756190, at *27 (N.D. Fla. Aug. 11, 2015), *aff'd sub nom.*, <u>Sullivan v. Sec'y, Fla. Dep't of Corr.</u>, 837 F.3d 1195 (11th Cir. 2016).  Given all of facts of this case, it was reasonable for Mr. Johnson to conclude that Hatterer could not clear that bar.  It was reasonable to not pursue a strategy centered on Hatterer's alleged inability to appreciate the nature, quality, and wrongfulness of her acts.  See <u>United States v. Black</u>, 739 F.3d 931, 933 (6th Cir. 2014) (defendant not entitled to insanity defense in prosecution for being felon in possession of firearm given evidence of his capacity to understand the wrongfulness of his actions).

Furthermore, even if Hatterer had established that Mr. Johnson rendered ineffective assistance by failing to investigate and pursue an insanity defense, Hatterer has failed to demonstrate that she suffered prejudice from that failure.  Rather, as laid out above, the record reveals that she had the ability to appreciate the nature, quality, and wrongfulness of her acts.  <u>Id.</u> ("Even if these rulings prejudiced [defendant's] effort to establish that he suffered from a severe mental disease or defect, any error was harmless because the evidence overwhelmingly establishes that he had the capacity to appreciate the wrongfulness of his acts.")  Further, Hatterer has not presented any evidence, much less a reasonable probability, that a psychological

evaluation would have found her legally insane. Hatterer has provided medical records, but those records do not indicate in any way that she was insane or incompetent.

For all these reasons, the Court **DENIES** Hatterer's claims based on ineffective assistance of counsel prior to her guilty plea.

### B. Hatter has Failed to Demonstrate that Mr. Johnson Rendered Deficient Assistance at Sentencing or that She Suffered any Prejudice From any Alleged Deficiencies.

To the extent that Hatterer argues that Mr. Johnson should have pursued or presented evidence regarding her mental illnesses at sentencing, the Court rejects that claim. Having reviewed the entirety of the record, the Court finds that Mr. Johnson's decision of what to focus on at sentencing was one of strategy that is left to the sound discretion of counsel. See United States v. Pozuelos–Morales, 526 F. App'x 74, 75 (2d Cir. 2013) ("A review of the sentencing proceeding makes clear that counsel's decision not to submit a sentencing memorandum and not to seek a downward departure [pursuant to U.S.S.G. § 5H1.3] were strategic decisions that do not constitute ineffective assistance of counsel."); Wilson v. Greene, 155 F.3d 396, 404 (4th Cir. 1998) ("Decisions about what types of evidence to introduce are ones of trial strategy, and attorneys have great latitude on where they can focus the jury's attention and what sort of mitigating evidence they can choose not to introduce." (citation omitted)); United States v. Ferguson, No. 04–CR–177–GKF, 2008 WL 5205651, at *4 (N.D. Okla. Dec. 11, 2008) ("Counsel's decision not to introduce into evidence the affidavit of [an affiant during the sentencing hearing] may be viewed as sound trial strategy because the reliability and credibility of the affidavit was subject to attack. 'Strategic decisions of trial counsel are ordinarily shielded from charges of ineffectiveness. Tactical decisions, whether wise or unwise, successful or unsuccessful, cannot ordinarily form the basis of a claim of ineffective assistance.'" (quoting

United States v. Murphy, 156 Fed. App'x 90, 93 (10th Cir. 2005))).  Particularly here, where counsel was urging the Court to sentence Hatterer below the otherwise mandatory statutory minimum sentence, it would have been unwise to focus on evidence ████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████████████████████████████████████  Additionally,  Mr. Johnson  also  focused  on  Ms.  Hatterer's  history  and  characteristics,  including  her  difficult childhood which the Court ultimately cited when sentencing her well below the guidelines range.

Moreover, to obtain a downward departure based on diminished capacity, Mr. Johnson would  have  had  to  show  "(1)  [Hatterer]  committed  the  offense  while  suffering  from  a significantly  reduced  mental  capacity;  and  (2)  the  significantly  reduced  mental  capacity contributed substantially to the commission of the offense."  U.S.S.G. § 5K2.13.  ████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

Furthermore, Mr. Johnson would have had to show that Hatterer had "a significantly impaired ability to (A) understand the wrongfulness of the behavior comprising the offense or to exercise the power of reason; or (B) control behavior that the defendant knows is wrong."  Id. cmt.

n. 1.  Given the above–described evidence that Hatterer played a significant and deliberate role in a substantial drug conspiracy and her repeated admissions to her own wrongdoing, it would have been foolish for Mr. Johnson to argue to the Court that Hatterer did not understand the wrongfulness of her actions or that she could not control her behavior.  United States v. Ruiz, 31 F. App'x 530, 531 (9th Cir. 2002) ("The district court also properly denied [defendant's] ineffective assistance claim without an evidentiary hearing as to the failure to move for downward departure. Even if [defendant] could prove his allegation that post–traumatic stress disorder rendered him more susceptible to committing this offense, such an allegation is not responsive to U.S.S.G. § 5K2.13.").  Indeed, pursuing such a strategy would have cut against Hatterer's acceptance of responsibility.  Moreover, to obtain a departure for Hatterer's "mental and emotional conditions," Mr. Johnson would have had to demonstrate that those conditions "are present to an unusual degree and distinguish the case from the typical cases covered by the guidelines."  U.S.S.G. §5H1.3.  Hatterer has failed to offer any evidence that she would have been able to make this showing.  Given these hurdles, the evidence against Hatterer, and the other arguments that defense counsel focused on at sentencing which were successful in obtaining a significantly reduced sentence, Mr. Johnson's decision not to focus on Hatterer's mental illnesses at sentencing was well within the bounds of competent assistance.  See, Simions v. United States, No. 12–1530, 2012 WL 13228693, at *1 (1st Cir. Nov. 21, 2012) ("defense counsel's decision to focus on petitioner's armed career criminal status rather than seeking a downward departure under United States Sentencing Guideline §§ 5K2.13 or 4A1.3(b)(1) was a reasonable tactical choice.").

Moreover, even if Hatterer had pointed out any deficiencies in Mr. Johnson's assistance at sentencing, she has failed to demonstrate that his assistance caused her any prejudice.  See,

Brown v. United States, No. 17–14215–C, 2018 WL 1474898, at \*2 (11th Cir. Feb. 21, 2018) ("Brown cannot show that trial counsel performed deficiently by failing to request a downward departure under § 5K2.13 or that the lack of such a request caused prejudice.").  The Court was aware of Hatterer's mental illnesses from the PSI.  (Doc. 411, ¶¶ 65–66.)  As the Court stated at sentencing, the Court carefully considered the entirety of the record, including the PSI, in determining Hatterer's sentence.  Thus, any information Mr. Johnson would have provided would have been duplicative of what the Court already knew.  See Alexander v. United States, No. 618CV339ORL28GJK, 2019 WL 4040161, at \*3 (M.D. Fla. Aug. 27, 2019) ("The Court knew of Petitioner's mental health history, considered it, and concluded that a downward variance was not warranted. . . . Petitioner, therefore, has not demonstrated a reasonable probability exists that he would have received a lesser sentence had counsel requested a full psychiatric evaluation.").  The evidence and argument Hatterer provides in support of her Section 2255 Motion does not in any way cause the Court to believe that her sentence was too harsh.  To the contrary, Hatterer's attempt to deflect blame and minimize the seriousness of her crimes indicates that she has not truly accepted responsibility for her actions and, thus, concerns the Court that her sentence should have been lengthier.

For all of these reasons, the Court **DENIES** Hatterer's putative claim that Mr. Johnson rendered ineffective assistance of counsel at the sentencing hearing.

### C.    Hatter has Failed to Demonstrate that Mr. Johnson Rendered Deficient Assistance Regarding the Filing of an Appeal.

Throughout her pleadings, Hatterer complains that Mr. Johnson told her that she could not appeal certain issues. (Doc. 647–1, p. 2; doc. 693–1, p. 14.)  Counsel has a constitutionally imposed duty to consult with the defendant about an appeal when there is reason to think either (1) that a rational defendant would want to appeal . . . or (2) that this particular defendant

reasonably demonstrated to counsel that he was interested in appealing." Roe v. Flores–Ortega, 528 U.S. 470, 480 (2000). "Even assuming that a rational defendant would not have wanted to appeal the case, [where a defendant] expressly communicated to his attorney his desire to appeal . . .[,] Flores–Ortega mandates that the attorney conduct a specific type of consultation, informing his client about the advantages and disadvantages of appealing and making a reasonable effort to determine the client's wishes." Gomez–Diaz v. United States, 433 F.3d 788, 792 (11th Cir. 2005).

It is well–settled that an attorney's failure to file a requested notice of appeal is *per se* ineffective assistance of counsel. Flores–Ortega, 528 U.S. at 470, 483–86; Gaston v. United States, 237 F. App'x 495 (11th Cir. 2007). A defendant claiming ineffective assistance on that score need not demonstrate an ability to raise meritorious issues on appeal. Flores–Ortega, 528 U.S. at 477–78. Instead, she can prove ineffective assistance by showing a "reasonable probability" that she would have timely appealed had counsel not failed to file an appeal on his behalf. Id. at 484. Further, even where a defendant has signed a waiver of direct appeal as part of his plea agreement (as Hatterer did in this case), she has no burden to show that the issue she would have raised on appeal falls outside of that waiver. Gaston, 237 F. App'x at 497; Gomez–Diaz, 433 F.3d at 793.

Here, the record is clear that Mr. Johnson did not fail to consult with Hatterer regarding an appeal or fail to file a requested appeal on Hatterer's behalf. Hatterer states that after her sentencing, Mr. Johnson discussed her appeal with her but through the discussion told her that she would not be able to appeal on certain issues. Mr. Johnson "conduct[ed] a specific type of consultation, informing his client about the advantages and disadvantages of appealing and making a reasonable effort to determine the client's wishes." Gomez–Diaz, 433 F.3d at 792.

The Court apprised Hatterer of her appeal rights, including the right to have the Clerk of Court file a notice of appeal on her behalf, at the conclusion of the sentencing hearing.  Hatterer does not allege that she directed Mr. Johnson to file an appeal at the conclusion of their discussion regarding an appeal.  Indeed, even if she had made such an allegation, the Post–Conviction Consultation Certificate, which Hatterer signed on November 10, 2019 (within the time to file an appeal), reflects that Hatterer advised Mr. Johnson that she did <u>not</u> want to file an appeal.  (Doc. 411.)  Through that Notice, Mr. Johnson certified—and Hatterer agreed—that Mr. Johnson met with Hatterer, explained to Hatterer the appellate process and her rights to appeal her conviction and sentence, advised Hatterer of the advantages and disadvantages of filing an appeal, and thoroughly inquired of her about his interest in appealing.  (<u>Id.</u>)  After this consultation, Hatterer "decided not to file an appeal, and [Mr. Johnson] explained to [Hatterer] the consequences of failing to do so."  (<u>Id.</u>)  Hatterer further acknowledged that "[t]hose consequences include the waiver of [Hatterer's] right to complain about the process that led up to [Hatterer's] conviction, including in the future, should [Hatterer] decide to seek any form of habeas corpus, 28 U.S .C. § 2255, or other judicial relief from the conviction."  (<u>Id.</u>)  Hatterer certified her agreement with these statements by printing and signing her name.  (<u>Id.</u>)  Hatterer has not denied any of the contents of this Notice or otherwise contested the validity of this Notice in any of her pleadings.  Additionally, Hatterer has not alleged that she directed Mr. Johnson to file an appeal after signing this document, in which she states that she did not want to file an appeal.  Thus, if Mr. Johnson had filed an appeal for Hatterer, he would have directly disregarded his client's written instructions to not file an appeal.

The Notice shows that Mr. Johnson fully explained the appellate process to Hatterer, apprised Hatterer of the advantages and disadvantages of an appeal, fully informed her of the consequences of that decision (including in a Section 2255 proceedings like this), and attempted diligently to ascertain her wishes.  It also shows that Hatterer expressly instructed Mr. Johnson not to file an appeal.  In the face of nothing more than self–serving conclusions, Hatterer will not now be heard to declare differently.  Cf. Winthrop–Redin v. United States, 767 F.3d 1210, 1216 (11th Cir. 2014) ("[A] prisoner has everything to gain and nothing to lose from filing a collateral attack upon his guilty plea. . . .  [Consequently,] the representations of the defendant . . . constitute a formidable barrier in any subsequent collateral proceedings.") (quoting Blackledge, 431 U.S. at 71–74); Rosin v. United States, 786 F.3d 873, 878 (11th Cir. 2015) ("It is well–settled that the district court is not required to grant an evidentiary hearing when the defendant's claims are affirmatively contradicted by the record evidence, nor is a hearing required if the claims are grounded upon generalizations that are unsupported by the record evidence.").  In short, the undisputed Notice of Post–Conviction Consultation establishes Hatterer's informed decision not to take an appeal and thwarts Hatterer's putative claims that counsel failed to consult with her regarding an appeal.  Price v. United States, No. CR614–016, 2017 WL 525869, at *4 (S.D. Ga. Feb. 8, 2017), *report and recommendation adopted*, No. CR614–016, 2017 WL 1393058 (S.D. Ga. Apr. 11, 2017) (Notice of Post–Conviction Consultation Certification and attorney's affidavit regarding same rebut Section 2255 claim that counsel neglected to apprise movant of the advantages and disadvantages of filing direct appeal); see also Eubank v. United States, No. CR414–005, 2016 WL 750344, at *1 (S.D. Ga. Feb. 25, 2016), *report and recommendation adopted*, No. CR414–005, 2016 WL 1464578 (S.D. Ga. Apr. 13, 2016),

*certificate of appealability denied*, No. 16–11933–F, 2016 WL 6246827 (11th Cir. Oct. 25, 2016) (Section 2255 motion denied wherein movant faulted her lawyer for failing to directly appeal, but Notice of Post–Conviction Consultation Certification memorialized her informed decision not to take an appeal); <u>Eason v. United States</u>, No. CR613–007, 2014 WL 4384652, at *3 (S.D. Ga. Sept. 3, 2014), *report and recommendation adopted*, No. CR613–007, 2014 WL 4956680 (S.D. Ga. Oct. 2, 2014) (same).

To the extent that Hatterer claims that Mr. Johnson rendered ineffective assistance of counsel by giving her deficient advice regarding her chances on appeal, the Court rejects that argument. Hatterer has not specifically outlined any advice that Mr. Johnson gave her that was incorrect or otherwise deficient, but she has generally stated that Mr. Johnson told her that she could not appeal certain issues. Hatterer's conclusory allegations do not suffice to allege that Mr. Johnson's advice regarding an appeal fell below an "objective standard of reasonableness." <u>Strickland</u>, 466 U.S. at 688. Moreover, even if that advice had fallen below an objective standard, Hatterer has not demonstrated how she was prejudiced by the deficiency.[12]

---

[12] It is important to note the distinctions between the above-discussed "lost appeal" claim (i.e., that Mr. Johnson failed to file an appeal) and Hatterer's putative "deficient advice" claim (i.e., that Mr. Johnson misadvised Hatterer regarding the likelihood of success on appeal). It is not clear if Hatterer intends to bring one or both of these claims. As to the lost appeal claim, if Hatterer had directed Mr. Johnson to file an appeal on her behalf and Mr. Johnson failed to do so, that would constitute *per se* ineffective assistance of counsel. <u>Flores-Ortega</u>, 528 U.S. at 470, 483–86. Thus, on the lost appeal claim, Hatterer need not demonstrate, and the Court need not assess, whether Hatterer could have raised meritorious issues on direct appeal. <u>Id.</u> at 477–78. Of course, Hatterer has not alleged, much less demonstrated, that she directed Mr. Johnson to file an appeal. In contrast, because the deficient advice claim questions counsel's assessment of the merits of an appeal, that claim necessarily involves the proposed grounds for appeal and their validity. On this claim, Hatterer would be essentially arguing that Mr. Johnson incorrectly told her that certain arguments would not succeed on appeal. Of course, to assess the correctness of counsel's advice, the Court must at the very least know what advice was given. Hatterer has provided no such information, much less specifically identified the grounds for appeal about which Mr. Johnson misadvised her. While Hatterer's failure to identify a meritorious ground for appeal would be of no moment to a "lost appeal" claim, it is fatal to his putative "deficient advice" claim.

The Court may presuppose that the issue underpinning Hatterer's deficient advice claim is the same argument discussed above—that the facts do not support her Section 924(c) conviction.  If Mr. Johnson advised Hatterer that she would not likely succeed on these issues on appeal, that advice would not have been deficient.  This argument would have failed on appeal because it falls squarely within Hatterer's plea agreement's direct appeal waiver.  See, e.g., United States v. Dandridge, 281 F. App'x 881, 883 (11th Cir. 2008) (appeal waiver barred defendant's argument on direct appeal that district erred at sentencing by denying his request for a minimal role reduction, refusing to adjust his sentence downward in light of the disparity between his sentence and his codefendants' sentences); United States v. Cifuentes, 159 F. App'x 883, 888 (11th Cir. 2005) (appeal waiver barred defendant's argument on directed appeal that court should have granted him minor role reduction because he was less culpable than many of those involved in the conspiracy).  Moreover, for the reasons pointed out above, even if the appellate court reached Hatterer's arguments, the arguments would not have been meritorious. Accordingly, it would have been objectively reasonable for Mr. Johnson to advise Hatterer that her arguments would not succeed on direct appeal.  Indeed, as part of the "specific type of consultation" required of counsel following sentencing, it would have been proper for Mr. Johnson to honestly communicate to Hatterer that these arguments lacked merit.  See Gomez–Diaz, 433 F.3d at 792.

Nor would it have been ineffective for Mr. Johnson to advise Hatterer that she could receive a higher sentence on remand after an appeal.  When assessing such an argument, United States Magistrate Judge G.R. Smith of this District explained:

> Citing North Carolina v. Pearce, 395 U.S. 711, 89 S. Ct. 2072, 23 L. Ed.2d 656 (1969), [the Section 2255 movant] also argued that [defense counsel] incorrectly advised [the movant] that she might face a higher sentence on remand after a successful appeal.  That, she contended, constituted ineffective assistance.  The

law on vindictiveness (what <u>Pearce</u> addresses), however, does not reach so broadly.

Certainly a presumption of vindictiveness arises when a prisoner successfully attacks a jury conviction and is then resentenced by the same judge after a second trial to a harsher sentence with no new evidence presented that justifies the increased prison time.  See <u>Alabama v. Smith</u>, 490 U.S. 794, 802 (1989) (citing <u>Pearce</u>, 395 U.S. at 725–26, 89 S.Ct. 2072).  But no such presumption attaches when, for example, a higher sentence results from a *trial* that occurs on the heels of a successfully attacked *guilty plea*.  See <u>Smith</u>, 490 U.S. at 803.  Nor is a higher sentence problematic under <u>Pearce</u> "when the increased sentence was imposed by the second court in a two–tiered system which gave a defendant convicted of a misdemeanor in an inferior court the right to trial *de novo* in a superior court," <u>Smith</u>, 490 U.S. at 800 (citing <u>Colten v. Kentucky</u>, 407 U.S. 104 (1972)), or when a higher sentence is imposed by a new jury (rather than a judge) after a second trial.  See <u>Chaffin v. Stynchcombe</u>, 412 U.S. 17 (1973).  Most critically, even when the original sentencing judge imposes a higher sentence after his original is overturned on appeal, the new sentence implies no vindictiveness when supported by "on–the–record, wholly logical, nonvindictive reasons." <u>Texas v. McCullough</u>, 475 U.S. 134,140 (1986).

When [defense counsel] told [the movant] that "she might get more time at a resentencing," then, he correctly conveyed the risks she faced and made no legal error that qualified as ineffective assistance.  [The movant] very much faced a higher sentence if, upon resentencing, the district judge concluded that record evidence logically supported its imposition and no actual evidence of vindictiveness existed.  See <u>Wasman v. United States</u>, 468 U.S. 559, 568 (1984); <u>see also id.</u> at 567 ("<u>Pearce</u> was not written with a view to protecting against the mere possibility that, once the slate is wiped clean and the prosecution begins anew, a fresh sentence may be higher for some valid reason associated with the need for flexibility and discretion in the sentencing process.").

<u>Diaz v. United States</u>, No. CR413–150, 2016 WL 928670, at *2 n.4 (S.D. Ga. Mar. 7, 2016),

*report and recommendation rejected on other grounds*, 192 F. Supp. 3d 1374 (S.D. Ga. 2016).

For all of these reasons, the Court **DENIES** Hatterer's claim that Mr. Johnson rendered

ineffective assistance by failing to properly consult with her regarding an appeal and any putative

claim that Mr. Johnson failed to file an appeal on her behalf.

### III.   HATTERER IS NOT ENTITLED TO LEAVE TO APPEAL *IN FORMA PAUPERIS* OR A CERTIFICATE OF APPEALABILITY.

The Court also denies Hatterer leave to appeal *in forma pauperis* and a Certificate of Appealability.  Though Hatterer has, of course, not yet filed a notice of appeal, it is proper to address these issues in the Court's order of dismissal.  Pursuant to Rule 11 of the Rules Governing Section 2255 Cases, "the district court <u>must</u> issue or deny a certificate of appealability when it issues a final order adverse to the applicant." (Emphasis supplied); <u>see also</u> Fed. R. App. P. 24(a)(3) (trial court may certify that appeal of party proceeding *in forma pauperis* is not taken in good faith "before or after the notice of appeal is filed").

An appeal cannot be taken *in forma pauperis* if the trial court certifies that the appeal is not taken in good faith.  28 U.S.C. § 1915(a)(3); Fed. R. App. P. 24(a)(3).  Good faith in this context must be judged by an objective standard.  <u>Busch v. Cty. of Volusia</u>, 189 F.R.D. 687, 691 (M.D. Fla. 1999).  A party does not proceed in good faith when she seeks to advance a frivolous claim or argument.  <u>See</u> <u>Coppedge v. United States</u>, 369 U.S. 438, 445 (1962).  A claim or argument is frivolous when it appears the factual allegations are clearly baseless or the legal theories are indisputably meritless.  <u>Neitzke v. Hatterer</u>, 490 U.S. 319, 327 (1989); <u>Carroll v. Gross</u>, 984 F.2d 392, 393 (11th Cir. 1993).  Stated another way, an *in forma pauperis* action is frivolous, and thus, not brought in good faith, if it is "without arguable merit either in law or fact." <u>Napier v. Preslicka</u>, 314 F.3d 528, 531 (11th Cir. 2002); <u>see also</u> <u>Brown v. United States</u>, Nos. 407CV085, 403CR001, 2009 WL 307872, at *1–2 (S.D. Ga. Feb. 9, 2009).

Additionally, under 28 U.S.C. § 2253(c)(1), an appeal cannot be taken from a final order in a habeas proceeding unless a certificate of appealability is issued.  A certificate of appealability may issue only if the applicant makes a substantial showing of a denial of a constitutional right.  The decision to issue a certificate of appealability requires "an overview of

the claims in the habeas petition and a general assessment of their merits." Miller–El v. Cockrell, 537 U.S. 322, 336 (2003). In order to obtain a certificate of appealability, a petitioner must show "that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." Id. "Where a plain procedural bar is present and the district court is correct to invoke it to dispose of the case, a reasonable jurist could not conclude either that the district court erred in dismissing the petition or that the petitioner should be allowed to proceed further." Slack v. McDaniel, 529 U.S. 473, 484 (2000); see also Franklin v. Hightower, 215 F.3d 1196, 1199 (11th Cir. 2000). "This threshold inquiry does not require full consideration of the factual or legal bases adduced in support of the claims." Miller–El, 537 U.S. at 336.

Based on the above analysis of Hatterer' pleadings and applying the Certificate of Appealability standards set forth above, there are no discernable issues worthy of a certificate of appeal. Therefore, the Court **DENIES** the issuance of a Certificate of Appealability. Hatterer is advised that she "may not appeal the denial but may seek a certificate from the court of appeals under Federal Rule of Appellate Procedure 22." Rule 11(a), Rules Governing Section 2255 Cases in the United States District Courts. Furthermore, as there are no non–frivolous issues to raise on appeal, an appeal would not be taken in good faith. Thus, the Court likewise **DENIES** Hatterer *in forma pauperis* status on appeal.

## CONCLUSION

The Court **GRANTS** Hatterer's Motion to Amend her Motion to Modify Sentence, (doc. 678). For the above–stated reasons, the Court **DENIES** Hatterer's Motion to Modify Sentence, (doc. 647), Motion to Vacate Sentence Under 28 U.S.C. § 2255, (doc. 693), and

Motion to Challenge District Court's Rule on 18 U.S.C. § 904(c), (doc. 694).     Additionally, the Court **DENIES** Hatterer's Motion to Appoint Counsel, (doc. 775), and **DENIES** Hatterer a Certificate of Appealability and *in forma pauperis* status on appeal.   Further, the Court **DIRECTS** the Clerk of Court to **CLOSE** this case and enter the appropriate judgment of dismissal.

    **SO ORDERED**, this 20th day of May, 2022.

R. STAN BAKER
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF GEORGIA